668 A.2d 1036

MARC SHERMAN, ON BEHALF OF HIMSELF AND ALL OTHERS AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFF–APPELLANT, v. CITIBANK (SOUTH DAKOTA), N.A., DEFENDANT–RESPONDENT.

Argued February 15, 1995—Decided November 28, 1995.

40 

*Michael D. Donovan,* a member of the Pennsylvania bar, argued the cause for appellant (*Spector Gadon & Rosen,* attorneys; *Mr. Donovan* and *Ann Miller,* a member of the Pennsylvania bar, of counsel; *Mr. Donovan, Ms. Miller, Paul R. Rosen,* and *Robert L. Grundlock, Jr.,* on the briefs).

*Louis R. Cohen,* a member of the District of Columbia bar, argued the cause for respondent (*Dechert Price & Rhoads,* attorneys; *Mr. Cohen, George G. O'Brien, Matthew V. DelDuca,* and *Robert D. Rhoad,* on the briefs).

*Marilyn A. Bair,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*James J.*

*Ciancia,* Acting Attorney General, attorney; *Andrea M. Silkow-itz,* Assistant Attorney General, of counsel).

*Richard P. Jacobson* submitted a brief on behalf of *amici curiae* The States of Arizona, Delaware, Louisiana, Nevada, Ohio, South Dakota, and Utah (*Dunn, Pashman, Sponzilli, Swick & Finnerty,* attorneys).

*Irene E. Dowdy,* Assistant United States Attorney, submitted a brief on behalf of *amicus curiae* Office of the Comptroller of the Currency (*Faith S. Hochberg,* United States Attorney, attorney).

*Charles N. Riley* submitted a brief on behalf of *amicus curiae* Consumer Action (*Tomar, Simonoff, Adourian & O'Brien,* attorneys).

*Charles N. Riley* submitted a brief on behalf of *amici curiae* the State of Hawaii, Iowa, Maryland, Massachusetts, Pennsylvania, South Carolina, Vermont, West Virginia, and Wisconsin (*Tomar, Simonoff, Adourian & O'Brien,* attorneys).

*Mark L. First* submitted a brief on behalf of *amicus curiae* Mellon Bank (DE), N.A. (*Reed, Smith, Shaw & McClay,* attorneys).

*Dennis R. Casale* submitted a brief on behalf of *amici curiae* The New Jersey Bankers Association, American Bankers Association, American Financial Services Association and Consumer Bankers Association (*Jamieson, Moore, Peskin & Spicer,* attorneys).

*Jeffrey M. Keiser* submitted a brief on behalf of *amici curiae* Trial Lawyers for Public Justice, P.C., and Bankcard Holders of America, Inc.

*Michael J. Dunne* submitted a brief on behalf of *amici curiae* Visa U.S.A., Inc., and Mastercard International Incorporated (*Pitney, Hardin, Kipp & Szuch,* attorneys).

HANDLER, J.

In this case, as in the companion case of *Hunter v. Greenwood Trust Co.,* 143 *N.J.* 97, 668 *A.*2d 1067, (1995) *rev'g* 272 *N.J.Super.*

526, 640 *A.*2d 855 (1994), also decided today, New Jersey credit-card customers contend that New Jersey's usury laws prohibit banks that issue those cards from charging late-payment fees to New Jersey customers.

The issues before us are more specifically framed by the claims and defenses of the respective parties. Plaintiff, as a named party in a class-action suit, challenges the legality of the late-payment fees that are charged to New Jersey holders of defendant Citibank (South Dakota) credit cards. Plaintiff argues that New Jersey's Retail Installment Sales Act of 1960, *N.J.S.A.* 17:16C–50, –54 (RISA), forbids national banks that issue credit-cards to New Jersey consumers from charging late-payment fees. Plaintiff also argues that defendant's failure to disclose in its cardmember agreements and advertising that late-payment fees are prohibited by New Jersey law violates New Jersey's Consumer Fraud Act (CFA), *N.J.S.A.* 56:8–2, –19. Finally, plaintiff contends that the imposition of late-payment fees constitutes a common-law breach of contract and conversion.

Defendant relies on section 85 of the National Bank Act (NBA), which provides that a national bank may charge borrowers "interest at a rate allowed by the laws of the State . . . where the bank is located." 12 *U.S.C.A.* § 85. Citibank is a national bank chartered in South Dakota, and South Dakota includes late-payment fees in its statutory definition of interest. 272 *N.J.Super.* at 435, 438, 640 *A.*2d 325 (1994). Citibank, therefore, contends that plaintiff's RISA claim, as well as plaintiff's other claims, conflict with, and are preempted by, section 85. *See id.* at 439, 640 *A.*2d 325. Thus, Citibank argues it is free to charge late-payment fees in New Jersey.

Following the commencement of this action, the Law Division granted the bank's motion to dismiss the complaint with prejudice. The Appellate Division affirmed. 272 *N.J.Super.* 435, 640 *A.*2d 325 (1994). We granted plaintiff's petition for certification, 138 *N.J.* 270, 649 *A.*2d 1289 (1994), and now reverse the dismissal of plaintiff's claims.

We determine that the understanding of "interest" as expressed and authorized in the NBA does not include distinctive and contingent loan terms or charges, such as late fees, that are unrelated to interest rates. We hold that late-payment fees are not "interest" within the intendment and purposes of the applicable federal statute. Rather, "interest at a rate allowed by the laws of the State ... where the bank is located" refers only to the periodic percentage rate charged on outstanding balances. Therefore, plaintiff's state-law defenses to the bank's charges do not conflict with federal law, are not preempted, and the late-payment fees are illegal under New Jersey law.

I

Since the early years of the Republic, the states have generally resisted the development of national banks and favored their own state-chartered banks through regulatory legislation. William Oscar Scroggs, *A Century of Banking Progress* 50–51 (1924); John J. Knox, *A History of Banking in the U.S.* 12 (2d ed. 1969). The Supreme Court has, since *M'Culloch v. Maryland*, 17 *U.S.* (4 Wheat.) 316, 4 *L.Ed.* 579 (1819), generally limited federal statutory involvement by construing preemption narrowly and giving relatively free rein to state usury law regulations. *See Anderson Nat'l Bank v. Luckett*, 321 *U.S.* 233, 64 *S.Ct.* 599, 88 *L.Ed.* 692 (1944); *McClellan v. Chipman*, 164 *U.S.* 347, 17 *S.Ct.* 85, 41 *L.Ed.* 461 (1896).

This Court, in considering preemption claims, must be cautioned by the longstanding presumption that "Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 *U.S.* 725, 746, 101 *S.Ct.* 2114, 2129, 68 *L.Ed.*2d 576, 595 (1981), and that it should not unnecessarily disturb "the federal-state balance." *United States v. Bass*, 404 *U.S.* 336, 349, 92 *S.Ct.* 515, 523, 30 *L.Ed.*2d 488, 497 (1971). Indeed, greater restraint ought apply to preemption of spheres traditionally occupied by the states. Where the field that Congress is said to have preempted has been traditionally occupied by the states, "we start with the assumption

that the historic police powers of the States were not to be superseded by the Federal Act unless there was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.,* 331 *U.S.* 218, 230, 67 *S.Ct.* 1146, 1152, 91 *L.Ed.* 1447 (1947).

"It is well settled that state usury law restrictions on lending practices are so extensive and historically rooted as to form part of the consumer protection terrain 'traditionally occupied' by the states." *Greenwood Trust Co. v. Massachusetts,* 776 *F.Supp.* 21, 27–28 (D.Mass.1991), *rev'd,* 971 *F.*2d 818 (1st Cir. 1992), *cert. denied,* 506 *U.S.* 1052, 113 *S.Ct.* 974, 122 *L.Ed.*2d 129 (1993) (citing *Lewis v. BT Inv. Managers, Inc.,* 447 *U.S.* 27, 38, 100 *S.Ct.* 2009, 2016, 64 *L.Ed.*2d 702, 713 (1980) ("We readily accept the submission that, both as a matter of history and as a matter of present commercial reality, banking and related financial activities are of profound local concern")); *Smiley v. Citibank (South Dakota), N.A.,* 11 *Cal.*4th 138, 44 *Cal.Rptr.*2d 441, 465–66, 900 *P.*2d 690, 714–15 (1995) (Arabian, J., dissenting) (same); *id.* at 467–68, 900 *P.*2d at 716–17 (George, J., dissenting) (same). Accordingly, "[b]ecause consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area." *General Motors Corp. v. Abrams,* 897 *F.*2d 34, 41–42 (2d Cir.1990) (upholding New York's "Lemon Law" against a claim that a Federal Trade Commission consent decree preempted major elements of the local law). Congress' failure to include an express preemption clause in section 85 necessitates a careful examination of whether the NBA conflicts with RISA's prohibition of late-payment fees.

Section 85 provides in pertinent part:

Any [national bank] association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidence of debt, *interest at a rate allowed by the laws of the State, Territory or District where the bank is located,* or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater ...

[12 *U.S.C.A.* § 85 (emphasis added).]

On its face, section 85 immunizes national banks that lend money beyond their home-state's borders from local usury laws that might give local banks a competitive advantage. It also protects national banks during periods of inflation by overriding even the home-state's usury laws and permitting national banks to charge interest at a rate tied to the federal discount rate. *E.g. Tiffany v. National Bank*, 85 *U.S.* (18 Wall) 409, 412–13, 21 *L.Ed.* 862, 863–64 (1874) (holding that Congress, by enacting NBA, intended to protect national banks from hostile state usury laws); *Roper v. Consurve, Inc.*, 578 *F.*2d 1106 (5th Cir.1978), *aff'd sub nom., Deposit Guaranty Nat'l Bank v. Roper*, 445 *U.S.* 326, 100 *S.Ct.* 1166, 63 *L.Ed.*2d 427 (1980) (holding section 85 was designed by Congress to mandate parity between national banks and local lenders). However, neither the plain meaning of the terms "rate" and "interest" in section 85, nor the legislative history of that provision indicates that these terms carry the expansive meaning inferred by defendant. *See Smiley, supra*, 44 *Cal.Rptr.*2d at 469, 900 *P.*2d at 718 (George, J., dissenting).

Since 1874, the Supreme Court has interpreted section 85 as entitling a national bank to charge the highest interest rate allowed to lenders by the laws of the state in which the bank is located. *Tiffany, supra*, 85 *U.S.* at 411–13, 21 *L.Ed.* at 863–64 ("The only mode of guarding against [state discrimination] was ... to allow to national associations the rate allowed by the state to natural persons generally, and a higher rate"). Courts have recognized that *Tiffany* construed section 85 to place national banks in a position of limited advantage over state banks by allowing them to charge interest at the highest rate applicable under state law to lenders generally and not necessarily at a rate applicable to state banks, which might be lower. This ability to "borrow" an interest rate has come to be known as the "most-favored-lender" doctrine. *See, e.g., Fisher v. First Nat'l Bank*, 548 *F.*2d 255 (8th Cir.1977) (recognizing that notwithstanding limitations on interest imposed on state banks by Nebraska law, national bank located in Nebraska could legally charge, with

respect to credit-card transactions, rates allowed by Nebraska law to small loan companies).

In *Marquette National Bank v. First of Omaha Service Corp.*, 439 *U.S.* 299, 99 *S.Ct.* 540, 58 *L.Ed.*2d 534 (1978), the Supreme Court relied on the NBA and its most-favored-lender doctrine to allow a national bank chartered in Nebraska to charge its credit-card customers in Minnesota a rate of interest authorized in Nebraska, but prohibited by usury law restrictions in Minnesota. *Id.* at 313–15, 99 *S.Ct.* at 548–49, 58 *L.Ed.*2d at 545–46. The *Marquette* Court recognized that the "exportation" of interest rates from a national bank's "home state" into a foreign state would "significantly impair the ability of the States to enact effective usury laws," but it found that such impairment "has always been implicit in the structure of the National Bank Act since citizens of one State were free to visit a neighboring State to receive credit at foreign interest rates." *Id.* at 318, 99 *S.Ct.* at 550, 58 *L.Ed.*2d at 548 (citation omitted) (footnote omitted).

The Court, nonetheless, suggested Congressional action would be necessary to check the preemptive effect of the NBA in a time of national bank deregulation, tightened credit availability, and an increasingly nationalized credit-card lending system:

> This impairment may in fact be accentuated by the ease with which interstate credit is available by mail through the use of modern credit cards. But the protection of state usury laws is an issue of legislative policy, and any plea to alter § 85 to further that end is better addressed to the wisdom of Congress than to the judgment of this Court.
>
> [*Id.* at 318–19, 99 *S.Ct.* at 550, 58 *L.Ed.*2d at 548.]

*Marquette* does not mandate or encourage an extension of the "most-favored-lender" status to expand the definition of "rates" to include other non-interest rate charges. The national bank's authorized exportation of lending terms in *Marquette* was limited to numerical percentage-rate interest terms. The Court made no mention of the exportation of other credit-card terms, such as late charges, nor did its reasoning or rationale imply that discrete and specialized charges affixed to credit-card loans could be imposed

on customers in other states. *See Smiley, supra*, 44 *Cal.Rptr.*2d at 465, 900 *P.*2d at 714 (Arabian, J., dissenting).

In the years following *Marquette,* Congress embarked on a mission to deregulate the banking industry. Interest rates soared, and while national banks could charge interest at a rate tied to the federal discount rate, state banks were constrained by local usury laws. *See Greenwood Trust, supra,* 971 *F.*2d at 826. Congress sought to rectify that obvious inequity by enacting the Depository Institutions Deregulation and Monetary Control Act of 1980, 12 *U.S.C.A.* § 1831d (DIDA). *Ibid.* The language of section 521 of DIDA essentially mirrors that of section 85 of the NBA. Courts and federal agencies have interpreted section 521 as conferring on federally-insured state banks the same insulation from state usury laws that national banks have enjoyed under the NBA. *Id.* at 826–27 (concluding that Section 521 permits federally-insured state banks to "export" interest rates); *VanderWeyst v. First State Bank,* 425 *N.W.*2d 803, 806 (Minn.) (concluding that section 521 gives federally-insured state banks "most favored lender" status), *cert. denied,* 488 *U.S.* 943, 109 *S.Ct.* 369, 102 *L.Ed.*2d 359 (1988).

The legislative history of DIDA is instructive to our understanding of Congress' general understanding of interest and its intent with respect to the notion of interest contained in the NBA. *E.g., Copeland v. MBNA America Bank, N.A.,* 907 *P.*2d 87, 93 (1995). Although the NBA was enacted 100 years earlier, the same tensions, namely parity between federal and state lenders and preservation of local usury laws, were present and these conflicting considerations generated substantial concerns surrounding the passage of the earlier banking statute.

The record of Congressional debate and deliberation concerning the enactment of DIDA strongly supports the understanding that preemption of credit-card regulation under DIDA is confined to traditional numerical interest rates. The central unifying purpose of DIDA was to provide for increased access to

home mortgage loans. Section 501 of DIDA provided for preemption of state usury limits on mortgage loans in a manner virtually identical to the treatment of other loans (including credit-card agreements) in Title V of the Act, which contains section 521.

The Senate Report of deliberations over section 501 of DIDA restricts preemption and expressly reserves the regulation of "late charges" to the states.

> In exempting mortgage loans from state usury limitations, the Committee intends to exempt only those limitations that are included in the annual percentage rate. The Committee does not intend to exempt limitations on prepayment charges, attorney fees, late charges or similar limitations designed to protect borrowers.
>
> [S.Rep. No. 96–368, 96th Cong., 2d Sess. 19, *reprinted in* 1980 *U.S.Code Cong. and Ad.News,* Vol. 2, 236, 255.]

Subsequent legislative history links preemption concerns in section 501 both to the consideration of section 521, and to DIDA in its entirety as passed on March 27–28, 1980. Notably, Congress passed section 501 at the same time, and the same title (Title V) of the same act, as section 521.

During the discussion on the Senate floor of the various bills that figured in the development of DIDA, Senators Pryor and Bumpers proposed an amendment, S. 1988, to give state-chartered institutions "competitive equality" with national banks by allowing them to charge interest at one percent above the federal discount rate. 125 *Cong.Rec.* 30655 (1979). Senator Proxmire, floor manager of the Senate bills under discussion, and chairman of the Senate Banking Committee, understood the proposed amendment to override state usury laws and emphasized that there was "a sharp division and difference of opinion in the Senate." *Id.*

Separate hearings on the Pryor–Bumpers initiative, S. 1988, 96th Cong. 1st Sess, (1979) were held December 17, 1979, and though it was not reported out of committee, the bill's language was substantially incorporated into House Bill 4986, H.R. 4986, 96th Cong., 1st Sess. (1979), which was, in turn, enacted as DIDA. William M. Burke & Alan S. Kaplinsky, *Unraveling the New Federal Usury Law,* 37 *Bus.Law.* 1079, 1096–97 and n. 102 (1982).

A fair reading of the legislative history indicates that Congressional concern was focused with particularity on numerical or percentage interest rates. In introducing S. 1988, Senator Pryor noted, "A national bank may charge one percent above the Federal discount rate, notwithstanding any State laws setting an interest-rate ceiling ... [which] obviously discriminates in the strongest possible way against State banks." 125 *Cong.Rec.* 30655 (1979). The great bulk of the subsequent committee testimony and discussion indicates that the proposed preemption amendment was limited because, in Senator Pryor's words, it "would merely allow State chartered, federally insured banks ... to charge the same interest rate as national banks." *Id.* In fact, there were only two references to wider displacement of state law though expansion of the "most-favored-lender doctrine." Senator Bumpers, co-sponsor of the preemption amendment, confined his remarks to numerical interest rate disparities and remarked pointedly, "I do not think it is particularly healthy to be overriding state law." *Id.*

Post–DIDA legislative history tends to confirm the conclusion that Congress in 1980 did not intend to bar states from prohibiting late fees by credit-card issuers. In 1981 and in 1983–84 the Senate (but not the House) passed amendments to DIDA which would have expanded preemption of state usury laws, but would have expressly exempted late charges from preemption. *Greenwood Trust, supra,* 776 *F.Supp.* at 31 (citing *Hearings on S. 730 Before the Senate Committee on Banking, Housing and Urban Affairs,* 98th Cong., 1st Sess. (April 12, 1983); Hearings on S. 1720, 1981.[1] The failed S. 730 bill also expressly granted states the right to override preemption.

---

[1] S. 730, the "Credit Deregulation and Availability Act of 1983," would have amended Title V of DIDA to provide, in relevant part, as follows:

Sec. 531. The provisions of the constitution or laws of any State prohibiting, restricting, or in any way limiting the rate, nature, type, amount of, or the manner of calculating or providing or contracting for covered charges

Thus, the fact that Congress was specifically concerned about effecting a preemption limited to numerical interest rates is significant. If we cannot attribute to legislative initiative of 15 years ago the intent to include discrete, specialized charges within a definition of interest, we cannot ascribe that expansive definition to a legislative initiative that occurred over 100 years earlier. That is especially so when the later statute substantially paralleled the language of the former, and it was passed in an effort to give federally-insured state banks status equal to national banks that had enjoyed a superior status since the enactment of the earlier act. Thus, it would be contrary to common sense to conclude that in enacting the NBA, Congress contemplated an open-ended and expansive concept of interest that was light years from the traditional understanding of a fixed, basic percentage rate applied to an unpaid loan balance. Or that, correlatively, it intended to prohibit states from regulating specific terms and conditions of loans and preventing lenders from charging late-payment fees.

## II

Defendant relies on case law from other jurisdictions to support its expansive interpretation of "interest", specifically, *Greenwood Trust, supra,* 971 *F.*2d 818 and *Tikkanen v. Citibank (South Dakota), N.A.,* 801 *F.Supp.* 270 (D.Minn.1992). We find, however,

---

that may be charged, taken, received or reserved shall not apply to any extension of consumer credit made by the creditor.

Sec. 532. (a) As used in this part—

(1) The term "covered charges" means—

(A) interest, discount, points, a time price differential, or any similar fees, charges, or other compensation paid to the creditor and arising out of the credit agreement or transaction for the use of credit or credit services. *The term shall not include, however, fees, charges or other amounts paid to the creditor or arising out of the credit agreement or transaction that are paid or arise solely as the result of the failure or refusal of the debtor to comply with the terms and conditions of the debtor's agreement with the creditor, including without limitation the fact that the obligation is not repaid in accordance with the payment schedule....*

[129 *Cong.Rec.*S. 17045–17046 (November 18, 1983) (emphasis added).]

that the reasoning expressed in the *Greenwood Trust* line of cases and the authorities cited by the *Greenwood Trust* court are unpersuasive and do not support the conclusion that Congress intended to include non-interest rate charges in its understanding of interest.

*Greenwood Trust* held that prior case law supported the notion that federal common law construes interest to encompass a variety of lender-imposed fees and financial requirements that are independent of a numerical percentage rate. 971 *F.*2d at 829 (citing *American Timber & Trading Co. v. First Nat'l Bank*, 690 *F.*2d 781, 787–88 (9th Cir.1982); *Fisher v. First Nat'l Bank*, 548 *F.*2d 255, 258–61 (8th Cir.1977); *Panos v. Smith*, 116 *F.*2d 445, 446–46 (6th Cir.1940); *Cronkleton v. Hall*, 66 *F.*2d 384, 387 (8th Cir.), *cert. denied*, 290 *U.S.* 685, 54 *S.Ct.* 121, 78 *L.Ed.* 590 (1933); *Nelson v. Citibank (South Dakota) N.A.*, 794 *F.Supp.* 312, 318 (D.Minn.1992)). Inimical to the holding in *Greenwood Trust*, a careful examination of the cases cited does not establish that Congress intended to include late-payment fees within a federal definition of interest under either section 85 or section 521.

Contrary to the *Greenwood Trust* court's interpretation, *American Timber & Trading Co., supra*, did not hold that a compensating-balance requirement was interest under section 85. Rather, the court held that a compensating-balance requirement reduces the principal amount of a loan for purposes of calculating effective interest. 690 *F.*2d at 787–88. In addition, *Fisher, supra*, did not expressly hold that cash-advance fees were interest under section 85. In that case, the plaintiff challenged the periodic interest and cash-advance fees charged by an out-of-state national bank. 548 *F.*2d at 256. The court applied the most favorable laws covering any class of lenders in the bank's home state, which permitted certain lenders to charge 30% interest on a balance under $300, and held that the charges were not usurious. *Id.* at 258–61. The court did not even discuss the distinction between periodic interest rates and the flat fees charged.

In *Panos, supra,* the court did not hold that mortgage taxes and recording fees were interest under section 85. Rather, the court held that such charges, which were deducted from the principal received by the borrower, reduced the principal amount of a loan for purposes of calculating effective interest. 116 *F.*2d at 446–47.

In *Cronkleton, supra,* the court did not conclude that a bonus or commission was interest under section 85. The Eighth Circuit's holding (in relevant part) was limited to a modification of the district court's award of damages for usury under the NBA. The court's opinion does not provide a detailed account of the facts. However, it appears that in February 1926, the defendant, a national bank, loaned $55,000 to the plaintiffs. 66 *F.*2d at 385. The contractual periodic rate of interest was not usurious. *Ibid.* But, in November 1930, plaintiffs paid to the bank an additional $1,000. *Ibid.* Although the district court "made no findings as to bonuses paid," the court characterized the additional payment as a bonus or commission. *Id.* at 386. The court then noted that "in determining the rate 'reserved' or 'charged' ... the taking of a 'bonus' or 'commission' ... may enter in to render an otherwise lawful rate unlawful and usurious." *Id.* at 387.

The *Greenwood Trust* court suggested that *Nelson, supra,* decided three months earlier, held that late-payment fees were interest under section 85. 971 *F.*2d at 829. However, *Nelson* expressly disclaimed that conclusion. 794 *F.Supp.* at 320 ("the question of whether national banks may export terms other than periodic interest charges goes to the merits of the case; deciding that question on a motion to remand is inappropriate"). The court held only that the defendant's claim that section 85 preempted plaintiffs' state law claims raised a substantial federal question. *Id.* at 315–16.

The court in *Greenwood Trust* also cited several cases to support the proposition that section 85 "adopts the entire case law of [a state bank's home] state interpreting the state's limitations on usury; it does not merely incorporate the numerical rate adopted by the state." 971 *F.*2d at 829 (citing *First Nat'l Bank v.*

*Nowlin,* 509 *F*.2d 872, 876 (8th Cir.1975); *accord Roper v. Consurve, Inc.,* 777 *F.Supp.* 508, 510–11 (S.D.Miss.1990), *aff'd,* 932 *F*.2d 965 (5th Cir.) (table), *cert. denied,* 502 *U.S.* 861, 112 *S.Ct.* 181, 116 *L.Ed.*2d 142 (1991); *Daggs v. Phoenix Nat'l Bank,* 177 *U.S.* 549, 555, 20 *S.Ct.* 732, 735, 44 *L.Ed.* 882 (1900); *Union Nat'l Bank v. Louisville, N.A. & C. Ry.,* 163 *U.S.* 325, 331, 16 *S.Ct.* 1039, 1042, 41 *L.Ed.* 177 (1896); *Bartholomew v. Northampton Nat'l Bank,* 584 *F*.2d 1288, 1295 (3d Cir.1978); *McAdoo v. Union Nat'l Bank,* 535 *F*.2d 1050, 1055–58 (8th Cir.1976); *Northway Lanes v. Hackley Union Nat'l Bank & Trust Co.,* 464 *F*.2d 855, 861–64 (6th Cir.1972)). Those cases, however, do not demonstrate that Congress intended to incorporate a state definition of interest that would authorize states unilaterally to incorporate non-percentage rate charges into an exportable definition under section 85. Moreover, none of those cases involve a definition of interest for exportation purposes where the definition varied between states.

*Nowlin, supra,* exemplifies the *Greenwood Trust* court's misplaced reliance on previous cases construing the NBA. In *Nowlin,* a national bank in Arkansas loaned money to the plaintiff, who agreed to repay the loan in installments. 509 *F*.2d at 874. Instead of amortizing the loan over the agreed term, the bank "discounted" the notes by 8%; that is, the bank gave the plaintiff the requested sum, but an additional 8% for every year of the notes' term was immediately added to the outstanding principal amount. *Ibid.* The plaintiff then had to repay the adjusted principal amount in equal payments over the term. *Ibid.* Because all interest was calculated up-front based on the initial loan amount, instead of being calculated periodically on a declining principal balance, the national bank achieved an effective yield of nearly 16%. *Ibid.*

The bank did not dispute that Arkansas considered usurious interest rates over 10%. *Id.* at 876. Furthermore, the bank did not dispute that a state bank could not "discount" notes in a like manner because Arkansas case law defined interest for purposes of its usury laws as "effective yield." *Ibid.* However, the bank

argued that because it was a national bank, it was subject only to section 85, which defined interest narrowly to include only percentage rates charged, not effective yields. *Ibid.* Because its 8% discount rate was less than the 10% Arkansas-usury rate, the bank argued that it did not violate the NBA. *Ibid.*

The court rejected the bank's arguments. After discussing the objectives of section 85, the court held that such a narrow interpretation would be inconsistent with Congress' desire to foster competitive equality between state and national banks. *Id.* at 880. Thus, the court held, Arkansas' definition of interest was incorporated into section 85. *Ibid.*

Contrary to the *Greenwood Trust* Court's conclusion, *Nowlin* does not offer an expanded definition of the term "rate," but rather shows only that calculation of chargeable interest rates must take "the case law of the state" into account. The state law regarding discounting was given substantial weight because discounting, unlike late-fee charges, directly affects the numerical interest rate by altering the percentage rate over time. It is noteworthy that the *Nowlin* decision involved the intra-state, not inter-state, application of Arkansas' definition of interest. Thus, it said nothing about exporting that definition to a foreign state where state-usury laws are more restrictive. Moreover, the case should be read as a judicial attempt to protect state usury laws at the expense of the federal most-favored-lender doctrine.

Defendant also refers, as does the dissent, to *Smiley v. Citibank, supra,* 11 *Cal.* 4th 138, 44 *Cal.Rptr.*2d 441, 900 *P.*2d 690 (1995), to support its position that "interest" under section 85 includes late charges. *Post* at 74, 668 *A.*2d at 1055. Similar use is made of *Copeland v. MBNA America Bank, N.A., supra,* 907 *P.*2d 87 (1995). The majority in *Smiley* bases that conclusion in large measure on its understanding of historical legal usage. *Smiley, supra,* 44 *Cal.Rptr.*2d at 449–51, 900 *P.*2d at 698–700. *See also Copeland, supra,* at 91–92 (same). In our view, however, interest in its historical setting is limited to a periodic charge expressed as

a percentage of a principal balance due. See discussion, *infra*, at 60–62, 668 *A.*2d at 1048–1049. The majority in *Smiley* also concluded that if interest does not include late charges then a state could discriminate against a national bank to make it unprofitable for it to lend money in that state. *Smiley, supra,* 44 *Cal.Rptr.*2d at 451, 900 *P.*2d at 700. However, a state cannot discriminate against a national bank by permitting state banks to charge late fees or higher late fees while prohibiting a national bank from charging those fees. See discussion, *infra* at 68–71, 668 *A.*2d at 1052–1053. *See Smiley, supra,* 44 *Cal.Rptr.*2d at 470, 900 *P.*2d at 719 (George, J., dissenting) (noting that it has been established since the early 1800's that even in the absence of a specific federal statutory prohibition a state may not discriminate against a federal instrumentality either in the enactment or enforcement of state laws). Thus, the most-favored-lender doctrine serves to eliminate discrimination without distorting or extending the meaning of interest to include charges that Congress neither expressly nor implicitly incorporated in the definition of interest.

### III

Defendant, as well as the dissent, cites a recently-promulgated proposed interpretive ruling by the Office of the Comptroller of the Currency (OCC), the agency charged with enforcement of the NBA, as evidence that late fees constitute interest for purposes of the NBA. *Post* at 82, 668 *A.*2d at 1059. The soundness of this ruling, and its value as authority, are greatly undermined when placed in the context of conflicting OCC rulings.

It is well settled that in general an agency's interpretation of a statute it is charged with enforcing is entitled to substantial deference, *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 *U.S.* 837, 843–45, 104 *S.Ct.* 2778, 2781–83, 81 *L.Ed.*2d 694, 703–04 (1984); *EPA v. National Crushed Stone Ass'n,* 449 *U.S.* 64, 83, 101 *S.Ct.* 295, 307, 66 *L.Ed.*2d 268, 283 (1980) (citing *Udall v. Tallman,* 380 *U.S.* 1, 16, 85 *S.Ct.* 792, 801, 13 *L.Ed.*2d 616 (1965)), and must in general be upheld even if that

interpretation is not the only permissible one or even the most reasonable. *Grocery Town Market, Inc. v. United States,* 848 *F.*2d 392, 396 (3d Cir.1988). There are, however, exceptions to the general rule.

Far less than the usual amount of deference to an agency interpretation is appropriate when that agency has failed to adopt a consistent interpretation in administering the statute in question. *INS v. Cardoza–Fonseca,* 480 *U.S.* 421, 446 n. 30, 107 *S.Ct.* 1207, 1221 n. 30, 94 *L.Ed.*2d 434, 457 n. 30 (1987) (citing *Watt v. Alaska,* 451 *U.S.* 259, 273, 101 *S.Ct.* 1673, 1681, 68 *L.Ed.*2d 80 (1981); *General Elec. Co. v. Gilbert,* 429 *U.S.* 125, 143, 97 *S.Ct.* 401, 411–12, 50 *L.Ed.*2d 343 (1976)).

"It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 *U.S.* (1 Cranch) 137, 177, 2 *L.Ed.* 60 (1803). Statutory construction is ultimately a judicial function. *See, e.g., SEC v. Sloan,* 436 *U.S.* 103, 118, 98 *S.Ct.* 1702, 1712, 56 *L.Ed.*2d 148, 161 (1978); *Federal Maritime Comm. v. Seatrain Lines, Inc.,* 411 *U.S.* 726, 745–46, 93 *S.Ct.* 1773, 1784–85, 36 *L.Ed.*2d 620, 633–34 (1973). Indeed, "one of the Judiciary's characteristic roles is to interpret statutes." *Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 *U.S.* 221, 230, 106 *S.Ct.* 2860, 2866, 92 *L.Ed.*2d 166, 179 (1986). Accordingly, the Supreme Court in *Chevron, supra,* did not state that silence or ambiguity in a statute automatically requires a court to delegate its entire interpretive responsibility to an agency, especially when an agency's interpretation is contrary to the purpose of the statute or inconsistent. *See West v. Bowen,* 879 *F.*2d 1122, 1138 (3d Cir.1989) (Mansmann, J., concurring and dissenting).

Courts have found consistency or lack thereof in an agency interpretation to be crucial in determining the degree of deference to be afforded that interpretation. *See, e.g., INS v. Cardoza–Fonseca, supra* (rejecting deference to Board of Immigration Appeals due to years of inconsistent positions); *Director, Office of Workers' Compensation Programs v. Mangifest,* 826 *F.*2d

1318, 1319–20 (3d Cir.1987) (finding "ambiguities and inconsistencies in the Director's interpretation of ... regulations ... sufficiently great to preclude deference"); *Revak v. National Mines Corp.*, 808 *F*.2d 996, 1002 (3d Cir.1986) (rejecting deference arguments due to inconsistent agency interpretation of statute); *Disabled in Action v. Sykes*, 833 *F*.2d 1113, 1117–19 (3d Cir.1987), *cert. denied*, 485 *U.S.* 989, 108 *S.Ct.* 1293, 99 *L.Ed.*2d 503 (1988). There is a great difference between flexibility and vacillation. Accordingly, judicial deference to administrative rulings should be cast on a sliding scale whereby the usual respect for agency determination diminishes as apparent inconsistencies surmount. *West, supra,* 879 *F*.2d at 1134 (Mansmann, J., dissenting and concurring).

The federal administrative understanding of the meaning of "interest" has wavered. *Cf. Copeland, supra,* 907 *P*.2d 87, 92 (asserting that "[t]he OCC *consistently* has taken the position that late payment fees are interest" under both section 85 of the NBA and section 521 of the DIDA) (emphasis added). An examination of OCC interpretive letters reveals significant inconsistent administrative treatment of interest with respect to the NBA. As early as 1964, the OCC, responding to an inquiry to define interest under the NBA, stated that "late payment fees ... would not properly be characterized as interest." *See* Letter by James J. Saxon, Comptroller of the Currency (June 25, 1964), Brief of Petitioner–Defendant at Ex C. (No. 38,817). Then, in 1986, the OCC was asked specifically whether late fees were considered interest that could be exported under section 85. Letter by Charles F. Byrd, Assistant Director, Legal Advisory Service (May 5, 1986), 1986 *WL* 143937 (O.C.C.). The agency opined that section 85 looks to state law to determine the maximum permissible interest rate, but that federal law determines which charges are "material" to the rate determination. *Id.* at *1. Because courts had not determined whether late fees were material, the OCC refused to provide the answer. *Ibid.*

In 1988, however, the OCC issued Interpretive Letter No. 452, which addressed whether various fees charged by an out-of-state national bank to its credit cardholder in Iowa were material to the determination of the interest rate under Section 85. Letter by Robert B. Serino, Deputy Chief Counsel, Office of the Comptroller of Currency [1988–1989 Transfer Binder] Fed. Banking L.Rep. (CCH) ¶ 85,676 at 78,063 (Aug. 11, 1988). The agency concluded that whether particular fees are material to the interest rate determination under section 85 depends on the laws of a national bank's home state. *Id.* at 78,065–66 (citing Interpretive Ruling 7.7310, 12 C.F.R. § 7.7310(a)).

The OCC recently has affirmed that position. *See* Letter by Peter Liebsman, Assistant Director, Bank Operations and Asset Division (February 26, 1993), 1993 *WL* 501557 at *2 (the "1993 OCC Letter"). However, because the State failed to define "materiality", the 1993 OCC Letter stated that "characteristics of either the loan or the borrower . . . [that are] an integral part of a bank's decision to establish the rate of interest that will be charged" typically are material. *Id.* at *3. Notably, the OCC opined that charges such as "late fees, nonsufficient check charges, cash advance fees and attorney fees appear not to determine the numerical rate of interest to be charged." *Id.* at *4. Because such fees have only an "indirect effect on interest rates in that they may affect the ultimate return on loan proceeds," the agency suggested that absent their inclusion in the home-state's definition of interest, they would not be material, and thus, would not be exportable. *See ibid.*

The conflicting interpretations, coupled with the logic expressed in the "materiality" standard, convince us that this Court should not forsake its own considered reasoning by relying on an equivocation. It is the responsibility of Congress to depart from the traditional understanding of interest and to express an intent to include non-numerical interest rates in its definition of "interest" under the NBA.

## IV

█ New Jersey's banking statutes also reflect the basic understanding that the notion of interest was conceived and continues to be defined as specific percentage rates, rather than discrete charges, such as late fees, which are not directly related to borrowing money. *N.J.S.A.* 17:13A, which governs installment loan rate advertising, defines interest as follows:

> every charge paid to the lender or contracted for by the lender and the borrower in connection with or as an incident of a loan, whether designated as interest or as a financial charge or otherwise, *except that the term does not include the following charges when made pursuant to law: late or delinquency charges;* attorneys' and collection fees; insurance premiums, including premiums for credit life insurance; recording or filing fees, and all other charges which may lawfully be made on loans in addition to interest or finance charges.
>
> [*N.J.S.A.* 17:13A–2(g) (emphasis added).]

Other statutes distinguish late fees from interest by either authorizing or prohibiting certain lending institutions from making such charges. *N.J.S.A.* 17:13–104b specifically authorizes New Jersey credit unions to charge late fees to its members.

> Notwithstanding the provisions of R.S. 31:1–1 to the contrary, a credit union may charge, contract for, and receive interest on loans at a rate or rates agreed to by the credit union and the member. A *credit union may charge late fees* and lawful fees paid to any public officer for filing, recording, or releasing a document, and may charge collection fees, not to exceed 20% of the principle balance and interest outstanding, which may be added to the principal balance of any loan placed for collection after default thereon.
>
> [*N.J.S.A.* 17:13–104b (emphasis added).]

*N.J.S.A.* 17:9A governs a banking institution's authority to make check loans and other loans, *N.J.S.A.* 17:9A–59.1 to –59.17, small business loans, *N.J.S.A.* 17:9A–59.25 to –59.39 and loans secured by a deposit, *N.J.S.A.* 17:9A–59.40–63. In defining the amount of interest permitted on each class of loans, the respective statutes specifically include only percentage *rate* interest, not other financial charges. Other charges are provided for in separate sections. For example, *N.J.S.A.* 17:9A–59.6, sets the rate of interest for advance loans. Later provisions provide for additional fees on advance loans, such as late charges, *N.J.S.A.* 17:9A–59.7, and service charges, *N.J.S.A.* 17:9A–59.8.

On the other hand, New Jersey's RISA prohibits lenders from charging late fees and other financial charges in addition to interest. The statute provides:

> No retail seller, sales finance company, or holder shall charge, ... directly or indirectly, any further or other amount for costs, charges, insurance premiums, examination, appraisal service, brokerage, commission, expense, interest, discount, fees, fines, penalties or other things of value in connection with ... retail charge accounts other than the charges permitted by this act....
>
> [*N.J.S.A.* 17:16C–50.]

At the time this case was before the Court, the statute expressly authorized delinquency or late-payment charges on only retail installment contracts. *N.J.S.A.* 17:16C–42(a). On March 7, 1995, however, the statute was amended by *L.* 1995, *c.* 43, § 1, which specifically allows for late-payment charges on retail charge accounts. It provides in pertinent part that:

> The holder of any retail charge account may collect a delinquency or collection charge in an amount not to exceed $10 if provided for in the retail charge account agreement, on any minimum payment which has not been paid in full for a period of 10 days after its due date, as originally scheduled.
>
> [*L.*1995, *c.* 43, § 1.]

The effective date of the amendment was May 29, 1995, 90 days following its enactment. *L.*1995, *c.* 43, § 2. Thus, for purposes of this appeal, defendant's late-fee charges were still illegal under RISA. This amendment to the statute indicates, however, that the legislature did not intend to include late-fee charges within its definition of interest; rather, it expressly specified when and under what conditions other non-percentage rate charges could be procured by lenders in addition to annual interest rate charges.

Moreover, the regulations governing banking specifically provide for the maximum *rate* of interest to be charged on the issuance of different types of loans. *N.J.A.C.* 3:1–1.1; *N.J.A.C.* 3:1–1.2. These regulations governing interest say nothing about other financial charges, such as late fees. Thus, the manner in which both the Legislature and the Department of Banking have chosen to regulate lender-authorized charges clearly supports the conclusion that late fees are distinct from interest and thus not contained within the accepted definition of interest. The dissent

incorporates late fees, and presumably other similar charges, into the notion of traditional interest by homogenizing what the Legislature has meticulously separated. It does so only by obscuring the clear language and structure of the legislative treatment of interest and late fees. *See Post* at 87–90, 668 *A.*2d at 1062–1063.

The State Bank Parity Act, *N.J.S.A.* 17:13B–1 to –2, authorizes New Jersey banks to charge the same "rate of interest" charged by credit unions. *N.J.S.A.* 17:13B–2 provides:

> Notwithstanding any provisions of R.S. 31:1–1 or any other statute to the contrary, any bank, savings bank, savings and loan association or credit union may charge a *rate* of interest on any class or type of loan at the rate of interest permitted to any other lender by the laws of this State on that class or type of loan.

> [*N.J.S.A.* 17:13B–2 (emphasis added).]

The Assembly Banking and Insurance Committee Statement that accompanied this legislation indicates that the act was intended as a state-bank companion to section 85 of the NBA.

> This legislation would give state chartered banks, savings banks, savings and loan associations, and credit unions the same "most-favored-lender" authority that national banks presently enjoy ... In practice, a national bank may charge interest on any type of loan at the highest rate allowed to any lender in the state making any similar type of loan. Thus, in certain cases, national banks may now use the rate permitted to be charged by secondary mortgage loan licensees, small loan companies (this rate will now apply to bank credit cards because of legislation passed last year), or home repair contractors. This legislation, therefore, provides parity to state-chartered institutions.

> [Assembly Banking & Insurance Committee, *Statement to Assembly Bill No. 1986* (1981).]

Thus, while the Act provides for parity between the rates of interest charged by both banks and credit unions, the act does not explicitly authorize banks to charge other types of fees. Furthermore, there is no indication that the Legislature implicitly intended these other fees in the State Bank Parity Act. Indeed, the fact that the Legislature has passed separate statutes that expressly authorize the imposition of discrete fees and charges, (see discussion, *supra*, at 59–62, 668 *A.*2d at 1047–1049), in contrast to interest, underscores the understanding that those types

of charges are not contemplated by the State Bank Parity Act. The clearest indication of the Legislature's intent to distinguish between interest rates and late fees is in the language of its recent amendment to RISA, in which it expressly authorizes holders of retail charge accounts, as well as retail installment contracts, to charge late fees. The Legislature obviously enacted this law because it wanted to enable banks and other retail charge-account holders to charge late fees that credit unions were permitted to charge under *N.J.S.A.* 17:13–104b. Had the State Bank Parity Act provided parity between lenders as to specific non-interest rate charges, there would have been no need for the amendment because holders of retail charge accounts would have been entitled, pursuant to the parity act, to charge the late fees that credit unions were authorized to charge. Courts should avoid a construction that would render legislative enactments meaningless. *State v. Reynolds,* 124 *N.J.* 559, 592 *A.*2d 194 (1991). Thus, by excluding discrete charges from the parity act, the Legislature retained flexibility with respect to the non-percentage rate fees different lenders were permitted to charge their customers. For example, retail charge account holders are limited to a $10 late-fee per default period, while credit unions have no such limitation.

The language of RISA itself indicates the legislative intent to leave room for subsequent legislative initiatives to allow different lenders to make discrete non-percentage rate charges; it states that a retail seller, sales finance company or holder cannot charge additional fees or charges "other than the charges permitted by this act." Thus, the Legislature, in reserving within the statute the ability to authorize certain charges, has correctly recognized that there may be specific reasons for treating different lenders differently. For example, there may be specific reasons for allowing a credit union, rather than a bank, to charge late fees. Credit unions are small, individualized lenders which do not cater to a large market. Furthermore, credit unions have a genuine social welfare purpose. In assisting their members they cannot spread costs like banks. Thus, they must be permitted to

take actions, such as charging late fees, to help insure their solvency.

The dissent points to a letter from the Department of Banking to support its theory that the State Bank Parity Act includes late fees in its definition of interest. *Post,* at 89–90, 668 *A.*2d at 1063 (citing Letter from Francis P. Carr, Assistant Commissioner, Department of Banking (Oct. 14, 1994)). Relying on an informal and isolated expression of agency interpretation has limited authoritative weight and does little to buttress its argument. Here, we are not presented with duly promulgated regulations that express legislative intent. *Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 331, 478 *A.*2d 742 (1984) (emphasizing that procedural requirements for passage of rules, involving notice and public participation, are given authoritative weight). Nor are we confronted with even a course of regulatory conduct that reflects a clear and consistent administrative understanding as evidence of an underlying legislative intent. *Body–Rite Repair Co., Inc. v. Director, Div. of Taxation,* 89 *N.J.* 540, 545–46, 446 *A.*2d 515 (1982) (holding that practical administrative construction of statute over period of years without interference by Legislature is evidence of conformity with legislative intent and should be given great weight by court). Clearly, a single letter from the Department of Banking does not constitute a settled or widespread course of administrative conduct that can be equated with the interpretive authority of a duly promulgated rule. Moreover, it cannot provide a meaning that is neither expressed in the statute, nor in the legislative scheme governing banking. Our deference does not go so far as to permit an administrative agency under the guise of an administrative interpretation to give a statute any greater effect than is permitted by statutory language. *In re Adoption of N.J.A.C. 7:26B,* 128 *N.J.* 442, 450, 608 *A.*2d 288 (1992) (citation omitted).

This Court has found no legislative authority to support the contention that interest in the context of either the State Bank Parity Act or the NBA encompasses a variety of lender-imposed

fees and financial requirements that are independent of a numerical percentage rate. Thus, we can conclude only that neither Congress, in passing the NBA, nor the New Jersey Legislature, through its own parity act, intended to include late fees in its definition of interest for the purpose of preventing discrimination against out-of-state lenders.

## V

Defendant argues that although the new RISA amendment is inapplicable to the charges assessed in this case, the fact that New Jersey credit unions were permitted to charge late fees at the time defendant procured those fees, pursuant to the most-favored-lender doctrine, entitled out-of-state national banks, like defendant, to charge late fees. We disagree.

Although a national bank may "borrow" the interest rate from any lending institution in its home state, without regard to whether that institution is actually "competitive" with a national bank, a national bank is not authorized to charge late fees simply because a state credit union is so authorized in a state other than its home state. Inter-state parity, as established in *Marquette*, is commonly identified as the notion that a national bank is entitled to export the interest authorized by its home state to borrowers located in other states that authorize a lower interest rates. *Marquette, supra,* 439 *U.S.* at 313–14, 99 *S.Ct.* at 548, 58 *L.Ed.*2d at 545. The defendant seeks to extend this inter-state parity notion by arguing that a foreign national bank lending to customers in New Jersey is entitled to charge the interest authorized by the state in which the bank is located *or* the interest authorized in New Jersey, whichever is higher, and that for purposes of determining what interest can be exported, all of the extra charges authorized by the borrower's state can be included as well. Thus, it argues a foreign national bank can charge late fees because New Jersey credit unions are permitted to charge them and, under the most-favored-lender doctrine, national banks can charge the same

interest—in its most expansive form—as any state lender. The argument, we find, overreaches the federal statutory scheme.

Section 85 of the NBA provides in pertinent part:

Any [national bank] association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidence of debt, *interest at a rate allowed by the laws of the State, Territory, or District where the bank is located,* or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more, except where by the laws of any State a different rate is limited for banks organized under state laws, *the rate so limited shall be allowed for associations organized or existing in any such state* under this chapter.

[12 *U.S.C.A.* § 85 (emphasis added).]

Section 86 reads in pertinent part:

The taking, receiving, reserving or charging a rate of interest greater than is allowed by section 85 of this title, when knowingly done, shall be deemed a forfeiture of the entire interest ... In case the greater rate of interest has been paid, the person by whom it has been paid, ... may recover back, ... twice the amount of the interest thus paid....

[12 *U.S.C.A.* § 86.]

For purposes of section 85, a national bank is located either in the place designated in its organizational certificate or in the places in which it has established authorized branches. *Marquette, supra,* 439 *U.S.* at 309 n. 21, 99 *S.Ct.* at 546 n. 21, 58 *L.Ed.*2d at 542–43 n. 21. A plain reading of the statute and most cases interpreting it indicate that a national bank is permitted to charge the interest rate of the state in which it is located, *not* the interest rate of the state in which the out-of-state customer is located. *Id.* at 301, 99 *S.Ct.* at 542, 58 *L.Ed.*2d at 537–38 (ruling that section 85 authorizes a national bank based in one state to charge its out-of-state credit card customers an interest rate on unpaid balances allowed by its home state, when that rate is greater than that permitted by the state of the bank's nonresident customers); *Cades v. H & R Block, Inc.,* 43 *F.*3d 869, 874 (4th Cir.1994) (determining that Delaware law applied to fix the interest rate when the bank located in Delaware, even though the loan occurred in South Carolina; "section 85, which looks to the interest rates allowed by the state where the bank is located—not

where the borrower is located or where the loan transaction may be said to have occurred").

Moreover, there is some indication that it is illegal for a national bank to charge interest in excess of that amount permitted in its home state. In *Panos v. Smith, supra,* 116 *F.*2d at 446, the court read sections 85 and 86 together to find that the NBA forbids a national bank to collect a higher rate of interest than is permitted by the law of the state in which it is located. Although none of these cases specifically dealt with a situation where the interest in the state of the customer was higher or more permissive than the national bank's home state, the basic understanding that resort to the higher level of interest would not be allowed is readily inferable from their treatment of the subject.

The theory of the NBA, as applied by federal and state courts, is that the borrower's state usury laws can be discarded because the customer either taking out a loan or using her "lender credit card" partakes in a transaction in the national lender's home state. *See Marquette, supra,* 439 *U.S.* at 318–19, 99 *S.Ct.* at 550, 58 *L.Ed.*2d at 548 (recognizing that impairment of state usury laws "has always been implicit in the structure of the National Bank Act, since citizens of one state were free to visit a neighboring state to receive credit at foreign interest rates"); *Schumacher v. Lawrence,* 108 *F.*2d 576, 577 (6th Cir.1940) (stating that the question whether the rate of interest charged by a national bank is usurious is decided according to the law of the state in which the transaction occurs); *Haas v. Pittsburgh Nat'l Bank,* 60 *F.R.D.* 604, 608 n. 3 (W.D.Pa.1973) (same); *Fisher v. First Nat'l Bank, supra,* 548 *F.*2d at 257 ("A[n] [Iowa] customer using this "lender credit card" ... communicates or indicates his intention to establish the credit card arrangement with BankAmericard when the lender, through banking channels, receives in the State of Nebraska the draft of the customer."). It is clear that Congress intended that the NBA and DIDA immunize national banks and out-of-state federally insured banks that lend money beyond their home-state's borders from local usury laws that might give local banks a

competitive advantage. *E.g., Tiffany, supra,* 85 *U.S.* at 412–13, 21 *L.Ed.* at 863–64 (holding that Congress, by enacting NBA, intended to protect national banks from hostile state usury laws); *Sherman v. Citibank (South Dakota), N.A.,* 272 *N.J.Super.* at 440, 640 *A.*2d 325 (same); *Hunter v. Greenwood Trust Company,* 272 *N.J.Super.* at 530, 640 *A.*2d 855 (same); 12 *U.S.C.A.* 1831d(a) (permitting State-chartered insured depository institutions to charge interest rates permitted in their home state "[i]n order to prevent discrimination against State-chartered insured depository institutions"). Thus, the statutes were intended to prohibit states from forcing national banks to charge a lower rate of interest to customers located outside of the national bank's home state than they would be permitted to charge their customers located in the home state.

■ We do not believe prohibiting national lenders from charging the rate of interest permitted by the laws of a foreign state would be considered discrimination when the national bank was not organized in that state and would not be able to charge higher interest rates except by taking advantage of the laws of the foreign state. New Jersey's RISA does not conflict with the most-favored-lender doctrine in this case, and thus New Jersey should be permitted to prohibit out-of-state lenders from charging late-fees to New Jersey residents, because, at the outset of this case, New Jersey banks were also prohibited from charging those fees. This finding would enable state usury laws to remain vital and controlling over non-interest rate credit terms. Consumer credit protection is a fundamental local interest, long recognized by Congress, and it thus should not be displaced by the sweeping preemption urged by defendant.

Because at the time of this appeal, RISA prohibited both New Jersey and national retail charge account holders from charging late fees, we hold that defendant's late-fee charges violated this state's usury laws and are thus impermissible.

## VI

Although the late-fee charges at issue in this case are impermissible under the RISA statute as it existed when those fees were assessed, we acknowledge, as suggested by the parties, that such charges assessed after May 29, 1995 do not appear to be illegal under that statute. As earlier discussed, *supra* at 61–62, 668 *A.*2d at 1048–1049, the Legislature amended the statute to permit "the holder of any retail charge account [to] collect a delinquency or collection charge" of no more than $10. *L.*1995, *c.* 43, § 1. Pursuant to the statute, a "holder" is "any person, including a retail seller, who is entitled to the rights of a seller under a retail installment contract or retail charge account." *N.J.S.A.* 17:16C–1(m). A "retail charge account" is

> any account ... established by agreement which prescribes the terms under which a retail buyer may from time to time purchase or lease goods or services which are primarily for personal, family or household purposes, and under which the unpaid balance thereunder, whenever incurred is payable in one or more installments and under which a time price differential may be added in each billing period as provided herein. Retail charge account also includes all accounts arising out of the utilization by the holder of a credit card ... issued by a sales finance company, giving the holder the privilege of using the credit card ... to become a retail buyer in transactions out of which debt arises.
>
> [*N.J.S.A.* 17:16C–1(r).]

Although the statute does not expressly include banks within these definitions, clearly banks have for years been performing the functions attributable to holders of retail charge accounts. *See N.J.S.A.* 17:3B–4 to –28 (Market Rate Consumer Loan Act) (authorizing New Jersey banks to offer revolving credit plans at an interest rate agreed to by lender and borrower); *N.J.S.A.* 17:9A–59.1 (permitting advance loans by banks). In fact, the statute expressly provides that "any banking institutions authorized to do business in this State, shall be authorized to transact business as a sales finance company." *N.J.S.A.* 17:16C–2. Thus, it appears that the Legislature intended to include banks that issue credit cards within those institutions authorized to assess late charges on overdue charge accounts. Therefore, a bank may

contract to charge the delinquency fee on the same basis as any other "holder of any retail charge account" in New Jersey.

Nothing in the statute indicates a legislative intention to allow state banks to charge delinquency fees while prohibiting national banks and federally-insured state banks from assessing those fees. In fact, the statute defines banking institutions generally as "any bank, national banking association, savings bank or federally chartered savings bank authorized to do business in this State". *N.J.S.A.* 17:16C–1(n). There is no distinction between a national banking association and an association under state laws except where the distinction is specifically made by Congress. *Anderson v. First Security Bank,* 54 *F.Supp.* 937 (D.Idaho 1944). States may not discriminate against national banks with respect to general contract terms or charges. *See Anderson Nat'l Bank v. Luckett,* 321 *U.S.* 233, 64 *S.Ct.* 599, 88 *L.Ed.* 692 (1944) (national banks are subject to state laws unless those laws infringe upon national banking laws or impose undue burden on performance of bank's functions); *National State Bank v. Long,* 630 *F.*2d 981, 985 (3d Cir.1980). Thus, national banks, as well as federally-insured state banks, are permitted to charge the late fees authorized by statute to the same extent as state banks.

However, New Jersey retains the authority to regulate on a non-discriminatory basis all non-interest rate contractual terms and conditions of a bank as a holder of a retail charge account. The Supreme Court has held that state law controls a bank's right to collect its debts.

> [National banks] are governed in their daily course of business far more by the laws of the State than of a nation. All their contracts are governed and construed by State laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on State law. It is only when the State law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional.
>
> [*National Bank v. Commonwealth,* 76 *U.S.* (9 Wall) 353, 362, 19 *L.Ed.* 701 (1870).]

Thus, it would appear that a national bank and a federally-insured state bank may, as of May 29, 1995, charge a delinquency fee in

accordance with the authorization now given by the statute. *See* *L.*1995, *c.* 43.

## VII

The judgment of the Appellate Division is reversed.

POLLOCK, J., dissenting.

This appeal poses the question whether a national bank located in South Dakota may impose a late charge on a credit-card customer who resides in New Jersey, if South Dakota permits the charge, but New Jersey does not. More specifically, the appeal focuses on whether the definition of "interest" in the National Bank Act (NBA), 12 *U.S.C.A.* § 85 (section 85), includes late charges, and, if so, whether that statute preempts the New Jersey Retail Installment Sales Act of 1960, *N.J.S.A.* 17:16C–1 to –94 (RISA).

In a class-action complaint brought on behalf of himself and other Citibank credit cardholders, petitioner, Marc Sherman, asserts that the RISA precludes defendant, Citibank (South Dakota), N.A. (Citibank), a national banking association located in South Dakota, from imposing late charges on cardholders located in New Jersey. The Law Division granted Citibank's motion to dismiss the complaint with prejudice. The Appellate Division affirmed. 272 *N.J.Super.* 435, 640 *A.*2d 325. The majority reverses. I dissent.

## –I–

Because the appeal arises from the grant of Citibank's motion to dismiss, I accept as true all facts alleged in the complaint. *See Bozza v. Vornado, Inc.,* 42 *N.J.* 355, 357–58, 200 *A.*2d 777 (1964). Sherman alleges that in 1989 Citibank sent to him at his New Jersey residence an application, Visa card, and Card Member Agreement. The record, however, does not include copies of these instruments. According to the complaint, the annual percentage-rate finance charge (periodic interest) is 19.8 percent. In addition,

a cardholder who does not make the minimum payment within twenty-five days of the due date is subject to a fixed late-payment fee regardless of the amount of the outstanding balance or delinquent payment. Twice Sherman was late in making his monthly payment. Each time, Citibank imposed a late charge.

Sherman claims that the late charges violate various provisions of New Jersey's Consumer Fraud Act, *N.J.S.A.* 56:8–2 and –19, and of the RISA, *N.J.S.A.* 17:16C–50 and –54. The Fraud Act prohibits undisclosed late charges, and the RISA prohibits delinquency charges on revolving credit accounts. He also claims that the late fees constitute a common-law breach of contract and conversion. All claims depend on whether Citibank may impose late charges as interest.

The initial task is to determine the meaning of "interest" in section 85. That section permits national banks to charge borrowers "interest at the rate allowed by the laws of the State ... where the bank is located." 12 *U.S.C.A.* § 85. South Dakota, the state where Citibank is located, defines "interest" to include late charges: "Interest is the compensation allowed by law for the use, or forbearance, or detention of money or its equivalent, including without limitation ... charges for unanticipated late payments, and any other charges, direct or indirect, as an incident to or as a condition of the extension of credit." *S.D.Codified Laws Ann.* § 54–3–1 (1995). Citibank claims that as a South Dakota bank it may impose late charges on defaulting customers whether those customers are located in South Dakota, New Jersey, or anywhere else.

Sherman, however, relies on the RISA, which permits credit-card issuers to charge periodic interest, but not late fees: "No retail seller, sales finance company, or holder shall charge, ... directly or indirectly, any further or other amount for costs, charges, insurance premiums, examination, appraisal service, brokerage, commission, expense, interest, discount, fees, fines, penalties or other things of value in connection with ... retail charge accounts...." *N.J.S.A.* 17:16C–50. He claims that "interest" in

section 85 refers to periodic interest, but not to late charges. Consequently, he denies that the RISA conflicts with the NBA.

–II–

Initially dividing the majority and the dissent is the meaning of the word "interest" as used in the NBA. Both agree that "interest" includes periodic interest, the amount paid for the use of money calculated as a percentage of the sum due for a stated period, typically one year. That definition, however, is not exhaustive. The meaning of the word becomes indeterminate at the margins. Webster's Dictionary, for example, accords "interest" seven definitions, six with subparts. Definition 3(a) defines "interest" as "the price paid for borrowing money generally expressed as a percentage of the amount borrowed paid in one year...." *Webster's Third New International Dictionary* (1976). The use of the adverb "generally" suggests the existence of other definitions. So construed, accepted usage recognizes that "interest" may include charges other than periodic interest. Consistent with that construction, the Supreme Court of California recently concluded that dictionary definitions of "interest" "then current in American legal usage" at the time of the passage of the NBA are broad enough to include late charges. *Smiley v. Citibank (South Dakota) N.A.*, 11 *Cal.*4th 138, 44 *Cal.Rptr.*2d 441, 450–51, 900 *P.*2d 690, 699–700 (1995).

More relevant than the meaning that lexicographers assign to statutory terms is the meaning assigned by the Legislature. To bridge the gap between dictionary definitions and legislative intent, the California Supreme Court apparently assumed that Congress consulted the dictionaries cited in *Smiley*. Dictionaries, however, are not essential to the judicial search for the meaning of statutory terms. *Cabell v. Markham*, 148 *F.*2d 737, 739 (2d Cir.1945). To illustrate, when deciding that "interest" in the NBA includes late charges, the Colorado Supreme Court recently concluded "that the common dictionary definitions are not sufficiently

precise to settle the question before us." *Copeland v. MBNA America, N.A.*, 907 *P.*2d 87, 91 (1995).

Absent an express statutory definition, courts may glean the meaning of legislative language from sources such as statutory history, purpose, and structure. In ascertaining the meaning of a statutory term, a court's task is not to create its own definition, but to ascertain the definition intended by the Legislature. *E.g., Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n,* 499 *U.S.* 117, 128, 111 *S.Ct.* 1156, 1163, 113 *L.Ed.*2d 95, 106–07 (1991); *Roig v. Kelsey,* 135 *N.J.* 500, 515, 641 *A.*2d 248 (1994). The NBA does not expressly define "interest." Nor does a fair reading of the legislative history of the statute disclose the intended meaning of that term. Accordingly, I search elsewhere for the word's meaning in the NBA.

The early history of national banking sheds some light on congressional intent in the NBA. Before enacting the NBA, Congress twice had tried unsuccessfully to create a Bank of the United States. Each time, however, states'-rights advocates defeated attempts to renew the Bank's charter. *See* John J. Knox, *A History of Banking in the United States* 35–48, 51–71 (1900) (discussing creation and dissolution of Bank of the United States and Second Bank of the United States); Bray Hammond, *Banks and Politics in America* 197–226, 369–450 (1957) (same). Then, in 1864, responding to the economic turmoil created by the Civil War, Congress adopted the NBA. Among other things, the NBA re-established a system of national banks. *See* Knox, *supra,* at 91–111 (discussing NBA); Hammond, *supra,* at 718–34 (same). To overcome local prejudice in favor of state banks, Congress included section 85. By mandating interest-rate parity in section 85, Congress sought to provide a level playing field for national banks throughout the United States. *See* Knox, *supra,* at 235–69. Although helpful, the history of the NBA is not dispositive of the meaning of interest in the NBA. *Copeland, supra,* at 91.

The United States Supreme Court first construed section 85 in *Tiffany v. National Bank of Missouri,* 85 *U.S.* (18 Wall.) 409, 21 *L.Ed.* 862 (1873). The plaintiff, Tiffany, challenged the legality of the ten-percent interest rate charged to Missouri borrowers by the defendant, National Bank of Missouri. Missouri's usury laws limited to eight percent the interest rate that state-chartered banks could charge, but allowed non-bank lenders to charge interest at a rate of ten percent. *Id.* at 411, 21 *L.Ed.* at 863. Reasoning that section 85 permitted the defendant national bank to charge interest at a "rate allowed by the laws of [Missouri]," the Court held that the bank could charge the highest interest rate that could be charged by any lender in that state. *Id.* at 411–13, 21 *L.Ed.* at 863–64. In so holding, the Court required states to treat national banks as a "most favored lender." *Id.* at 413, 21 *L.Ed.* at 864. Although the Court acknowledged that its holding might disadvantage state-chartered banks, it relied on the overriding congressional intent to create a strong national banking system immune from unfriendly state legislation. *Id.* at 412–13, 21 *L.Ed.* at 863–64. "National banks," the Court declared, are "national favorites." *Id.* at 413, 21 *L.Ed.* at 864.

Over a century later, the Court revisited section 85 in *Marquette National Bank v. First of Omaha Service Corp.,* 439 *U.S.* 299, 99 *S.Ct.* 540, 58 *L.Ed.*2d 534 (1978). The plaintiff, Marquette National Bank of Minnesota (Marquette), challenged the interest rate charged by a Nebraska national bank to Minnesota credit cardholders. Minnesota law prohibited banks in that state from charging more than twelve percent on credit-card balances, but allowed them to charge an annual fee up to $15. *Id.* at 302–03, 99 *S.Ct.* at 542–43, 58 *L.Ed.*2d at 538. Nebraska law, however, allowed banks to charge up to eighteen percent on outstanding credit-card balances below $1,000. *Id.* at 302, 99 *S.Ct.* at 542, 58 *L.Ed.*2d at 538. First National Bank of Omaha (Omaha Bank), a national bank chartered in Nebraska, charged eighteen percent interest on outstanding balances of Minnesota credit cardholders. *See id.* at 304, 99 *S.Ct.* at 543, 58 *L.Ed.*2d at 539. Marquette claimed it was losing customers to Omaha Bank because "Mar-

quette was forced by the low rate of interest permissible under Minnesota law to charge a $10 annual fee for the use of its credit cards." *Ibid.*

The Court determined that although the cardholders lived and made credit-card purchases in Minnesota, Omaha Bank was "located" in Nebraska. *Id.* at 310–13, 99 *S.Ct.* at 546–48, 58 *L.Ed.*2d at 543–45. Consequently, Omaha Bank could charge the favorable Nebraska rate to its customers in Minnesota. *Id.* at 313–14, 99 *S.Ct.* at 548, 58 *L.Ed.*2d at 545. As in *Tiffany, supra,* 85 *U.S.* at 412–13, 21 *L.Ed.* at 863–64, the Court noted the clear congressional intent to favor national banks, even at the expense of state banks. *Marquette Nat'l Bank, supra,* 439 *U.S.* at 314–18, 99 *S.Ct.* at 548–50, 58 *L.Ed.*2d at 545–48.

Although *Tiffany* and *Marquette* discussed permissible rates of interest under section 85, they did not define "interest." Recent federal decisions, however, illuminate the meaning of interest in section 85. *See Greenwood Trust Co. v. Massachusetts,* 971 *F.*2d 818 (1st Cir.1992), *cert. denied,* 506 *U.S.* 1052, 113 *S.Ct.* 974, 122 *L.Ed.*2d 129 (1993); *Tikkanen v. Citibank (South Dakota), N.A.,* 801 *F.Supp.* 270 (D.Minn.1992).

*Greenwood Trust* involved a federally-insured state bank chartered in Delaware that issued credit cards throughout the United States, including Massachusetts. 971 *F.*2d at 821. The bank, Greenwood Trust Company, imposed late charges on its delinquent credit-card customers. Delaware law, like South Dakota law, characterizes late charges as "interest." *Id.* at 829. The state claimed that Massachusetts' consumer-protection law, like the RISA, prohibited late charges. *Id.* at 821. Greenwood Trust argued, however, that by reference to the law of Delaware, the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDA) authorized it to charge late fees as interest.

Section 521 of the DIDA grants the same protection to federally-insured state banks that section 85 of the NBA provides to national banks. Section 521 provides that any federally-insured state bank may,

notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank ... is located or at the rate allowed by the laws of the State ... where the bank is located, whichever may be the greater....

[12 *U.S.C.A.* § 1831d(a).]

The United States Court of Appeals for the First Circuit ruled that under section 521 Greenwood Trust could charge its Massachusetts cardholders the highest interest rate allowed by Delaware law. *Greenwood Trust, supra,* 971 *F.*2d at 827. The court determined that both Delaware's express statutory provision, *Del. Code Ann.* tit. 5, § 950 (1994), and federal common law support a broad definition of "interest" that includes late fees. 971 *F.*2d at 829–30 (citing *American Timber & Trading Co. v. First Nat'l Bank,* 690 *F.*2d 781, 787–88 (9th Cir.1982) (compensating balance requirement); *Fisher v. First Nat'l Bank,* 548 *F.*2d 255, 258–61 (8th Cir.1977) (cash-advance fee); *Panos v. Smith,* 116 *F.*2d 445, 446–47 (6th Cir.1940) (mortgage, taxes, and recording fees); *Cronkleton v. Hall,* 66 *F.*2d 384, 387 (8th Cir.) (bonus or commission), *cert. denied,* 290 *U.S.* 685, 54 *S.Ct.* 121, 78 *L.Ed.* 590 (1933); *Nelson v. Citibank (South Dakota) N.A.,* 794 *F.Supp.* 312, 318 (D.Minn.1992) (late fees)). Thus, the court concluded that for purposes of section 521, "interest" includes late fees, and that Greenwood Trust could "export" those charges authorized by Delaware law to Massachusetts. *Greenwood Trust, supra,* 971 *F.*2d at 831.

The vast majority of state and federal courts have followed *Greenwood Trust. E.g., Ament v. PNC Nat'l Bank,* 849 *F.Supp.* 1015 (W.D.Pa.1994); *Watson v. First Union Nat'l Bank,* 837 *F.Supp.* 146 (D.S.C.1993); *Goehl v. Mellon Bank,* 825 *F.Supp.* 1239 (E.D.Pa.1993); *Smiley, supra,* 44 *Cal.Rptr.*2d at 453, 900 *P.*2d at 702; *Stoorman v. Greenwood Trust Co.,* 888 *P.*2d 289 (Colo.Ct.App.), *rehearing denied,* (May 26, 1994), *cert. granted* (Jan. 30, 1995); *Copeland, supra,* 907 *P.*2d 87; *Hunter v. Green-*

*wood Trust Co.,* 272 *N.J.Super.* 526, 640 *A.*2d 855 (App.Div.1994); *Sherman, supra,* 272 *N.J.Super.* 435, 640 *A.*2d 325.

*Tikkanen, supra,* 801 *F.Supp.* 270, reached the same conclusion under section 85 as *Greenwood Trust* had reached under section 521. In *Tikkanen,* which is virtually identical to this appeal, the plaintiff argued that section 85's definition of interest was restricted to numerical periodic interest rates and did not include late-payment charges authorized by South Dakota, the defendant national bank's home state. 801 *F.Supp.* at 277. The federal district court held, however, that interest under section 85 was not limited to percentage-rate charges and could include fixed late fees. *Id.* at 276–78. Although the court did not announce a federal definition of interest that included late fees, it held that if a national bank's home state defines interest to include such fees, then the bank may "export" those fees under section 85. *Id.* at 279.

Rejecting the *Greenwood Trust* and *Tikkanen* line of cases, lower courts in Pennsylvania have held that "interest" does not include late-payment fees. *Mazaika v. Bank One, Columbus, N.A.,* 439 *Pa.Super.* 95, 653 *A.*2d 640 (1994), *appeal granted,* 540 *Pa.* 638, 659 *A.*2d 557 (1995);. *Gadon v. Chase Manhattan Bank,* 439 *Pa.Super.* 210, 653 *A.*2d 697 (Pa.Super.1995) (following *Mazaika* ). One United States District Court has reached a similar conclusion. *Copeland v. MBNA America, N.A.,* 820 *F.Supp.* 537 (D.Colo.1993) (denying federal jurisdiction based on complete preemption defense because "ordinary meaning" of interest does not encompass late fees).

In *Mazaika, supra,* 653 *A.*2d at 646, a Pennsylvania intermediate appellate court stated that "[i]t would appear beyond peradventure that the plain and ordinary meaning of the term 'interest' or 'interest rate' does not include late fees, ... or the like which are not levied on a percentage basis." I find, however, that the meaning of "interest" and "rate of interest" are not as plain as the *Mazaika* court found them. As the OCC has concluded, *infra* at 82–83, 668 *A.*2d at 1059–1060, interest could include all charges for

the "use or forbearance of money," including late fees. *See Brown v. Hiatts*, 82 *U.S.* (15 Wall.) 177, 185, 21 *L.Ed.* 128, 131 (1872).

–III–

The modern history of banking has been one of expanding regulation. Banks are subject to regulation by multiple federal agencies. The Comptroller of the Currency, 12 *U.S.C.A.* § 1; the Federal Housing Finance Board, 12 *U.S.C.A.* § 422a; the National Credit Union Administration, 12 *U.S.C.A.* § 1752a; the Federal Deposit Insurance Corporation, 12 *U.S.C.A.* § 1811; the Office of Thrift Supervision, 12 *U.S.C.A.* § 1462a; and the Board of Governors of the Federal Reserve System, 12 *U.S.C.A.* § 248, all regulate various aspects of banking. In addition, banks often are subject to dual regulation by state banking authorities.

With banking, as with other heavily-regulated commercial activities, Congress has recognized that it cannot maintain an efficient regulatory system through constant recourse to the legislative process. *See* Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 3.1 (3d ed. 1994) ("It is impossible to draft a statute with sufficient precision and foresight to resolve each of the hundreds of issues that are likely to arise during the life of the statute."); Cass R. Sunstein, *Law and Administration after Chevron*, 90 *Colum.L.Rev.* 2071, 2088 (1990) ("Congress is unable to amend every statute to account for ... changes...."). Consequently, it has authorized administrative agencies to implement specific congressional objectives. When Congress delegates authority to an administrative agency, the judicial role is not to pass on the wisdom of an agency's decision, but to assure that the agency has not abused its delegated authority. Davis & Pierce, *supra*, at § 3.3; Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 *Duke L.J.* 511, 516; Richard J. Pierce, Jr., *Chevron & Its Aftermath: Judicial Review of Agency Interpretations of Statutory Provisions*, 41 *Vand.L.Rev.*

301, 307–08 (1988); Kenneth W. Starr, *Judicial Review in the Post-Chevron Era,* 3 *Yale J. on Reg.* 283, 300–04 (1986).

Absent clear indicia of legislative intent, courts often look for guidance to the administrative agency entrusted with the regulation of matters covered by a statute. *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.,* 513 *U.S.* ——, ——, 115 *S.Ct.* 810, 813–14, 130 *L.Ed.*2d 740, 748 (1995); *Chevron, U.S.A., Inc. v. NRDC,* 467 *U.S.* 837, 842–44, 104 *S.Ct.* 2778, 2781–83, 81 *L.Ed.*2d 694, 702–03 (1984); *Blum v. Bacon,* 457 *U.S.* 132, 141, 102 *S.Ct.* 2355, 2361, 72 *L.Ed.*2d 728, 736 (1982); *Lammers v. Board of Educ.,* 134 *N.J.* 264, 274, 633 *A.2d* 526 (1993); *Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 327, 478 *A.*2d 742 (1984). In *NationsBank of North Carolina, N.A., supra,* 513 *U.S.* at ——, 115 *S.Ct.* at 813, 130 *L.Ed.*2d at 747, the United States Supreme Court recently reiterated:

" 'It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of the banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of these laws.' " *Clarke v. Securities Industry Ass'n,* 479 *U.S.* 388, 403–404, 107 *S.Ct.* 750, 759, 93 *L.Ed.*2d 757 (1987) (quoting *Investment Company Institute v. Camp,* 401 *U.S.* 617, 626–627, 91 *S.Ct.* 1091, 1097, 28 *L.Ed.*2d 367 (1971)).

In *Chevron,* the United States Supreme Court developed a two-part test for determining whether deference to an agency interpretation of a statute is appropriate. First, the statute that the agency purports to interpret must be unclear. 467 *U.S.* at 842–43, 104 *S.Ct.* at 2781–82, 81 *L.Ed.*2d at 703. When Congress has not defined an important statutory term, courts fairly can presume that Congress intended the agency to provide a definition. *Id.* at 843–44, 104 *S.Ct.* at 2782, 81 *L.Ed.*2d at 703; *see also* Davis & Pierce, *supra,* at § 3.3 (discussing *Chevron* and presumption of congressional delegation); Scalia, *supra,* at 516–17 (same).

In 1864, Congress may not have contemplated specifically that banks would issue credit cards or even that interest would include late fees. Even so, I believe that Congress intended to delegate to the OCC the authority to implement the goals of the NBA. Also likely, Congress intended that in meeting those goals the

OCC would adapt to the changing needs of banks and their customers. That adaptation foreseeably includes administrative changes in the definition of "interest." In brief, I believe that federal banking regulators are in a better position than state courts to define the meaning of "interest" in the NBA. That conclusion, in my opinion, also represents sound public policy. On a matter so essential to the national economy as the meaning of "interest" in federal banking legislation, the nation is better served by judicial deference to the judgment of Congress and the banking regulators.

The second part of the *Chevron* test directs courts to defer to reasonable agency interpretations. 467 *U.S.* at 844–45, 104 *S.Ct.* at 2782–83, 81 *L.Ed.*2d at 704; *see also* Davis & Pierce, *supra,* at § 3.3; Scalia, *supra,* at 516–18. Implicit in the notion of reasonableness is discretion in choosing among alternatives. In defining "interest" to include late charges, the OCC has made a reasonable choice among possible definitions of interest. Of course, if Congress should disagree with the agency's interpretation, it retains the authority to redefine the term. *See, e.g., CFTC v. Schor,* 478 *U.S.* 833, 845–46, 106 *S.Ct.* 3245, 3254, 92 *L.Ed.*2d 675, 689 (1986) (suggesting that Congress's failure to overrule agency supports conclusion that agency definition comports with congressional intent).

The OCC consistently has determined that late-payment and certain other non-periodic fees are interest for purposes of section 85 of the NBA. In a recent interpretive letter, the agency concluded that a federal definition of "interest" under section 85 includes late fees. Letter by Julie L. Williams, Chief Counsel (Feb. 17, 1995), 1995 *WL* 419824 (O.C.C.). Earlier letters, although relying on the law of the national bank's home state, reached the same conclusion. *See* Letter by William P. Bowden, Jr., Chief Counsel (Feb. 4, 1992), 1992 *WL* 136390 (O.C.C.) at *9–*11 (concluding that state law determines fees material to definition of interest) (the Bowden Letter); Letter by Robert B. Serino, Deputy Chief Counsel, Office of the Comptroller of Currency [1988–89 Transfer Binder] *Fed.Banking L.Rep.* (CCH) ¶ 85,676 at

78,063 (Aug. 11, 1988) (same) (the Serino Letter); Letter by Charles F. Byrd, Assistant Director, Legal Advisory Services (May 5, 1986), 1986 *WL* 143937 (O.C.C.) at *3 (concluding that state law determines maximum interest rate). *But see* Letter from Peter Liebesman, Assistant Director, Bank Operations and Assets Division (Feb. 26, 1993), 1993 *WL* 501557 (O.C.C.) at *9 (suggesting in *dicta* that late fees are not material to definition of interest absent state law conclusion to contrary). In sum, the OCC consistently has concluded that if a state allows any lender to charge interest in the form of late-payment fees, a national bank located in that state may charge those fees to its out-of-state borrowers.

To confirm that interest, for purposes of the NBA, includes late fees, the OCC recently promulgated proposed Interpretive Ruling § 7.4001 for inclusion in the Code of Federal Regulations. 60 *Fed.Reg.* 11924, 11940 (1995) (to be codified at 12 *C.F.R.* 7.4001) (proposed March 3, 1995). The proposed ruling states:

> The word "interest" as used in 12 U.S.C. § 85 includes any payment compensating a creditor or prospective creditor for any extension of credit, the making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended. It includes, among other things, ... numerical periodic rates, late fees, not sufficient funds fees, overlimit fees, annual fees, cash advance fees, and membership fees.

If adopted, the proposed ruling would further evidence the OCC's conviction that late fees are interest. The majority's cavalier dismissal of the proposed ruling, *ante* at 57–58, 668 *A.*2d at 1046–1047, fails to consider the ruling's significance.

The agency's definition of "interest," as expressed in its interpretive letters, is clear. The judicial task is to determine whether that interpretation is reasonable. *NationsBank, supra,* 513 *U.S.* at ——, 115 *S.Ct.* at 813, 130 *L.Ed.*2d at 748; *Chevron, supra,* 467 *U.S.* at 843–44, 104 *S.Ct.* at 2782–83, 81 *L.Ed.*2d at 704. In its February 17, 1995, interpretive letter, *supra,* the OCC documented early federal case law that defined "interest" as the "compensation allowed by law, or fixed by the parties, for the use or forbearance of money, or as damages for its detention." *Brown, supra,* 82 *U.S.* (15 *Wall.*) at 185, 21 *L.Ed.* at 131. The letter then

concludes that late-payment fees, which legitimately compensate lenders for increased lending costs and risks associated with delinquent borrowers, are interest.

The OCC's conclusion is reasonable. It permits a national bank to charge any fees related to the use of money, if those charges are authorized by the bank's home state. That concept of parity comports with the NBA's goal of preventing discrimination against national banks. No principled reason confines the NBA to periodic interest rates.

Contrary to the protestations of the majority, *ante* at 57–60, 668 *A.*2d at 1046–1048, the evolution of the OCC's analysis does not render its opinion unworthy of judicial deference. *Chevron* counsels that an agency's change in a policy determination is not necessarily entitled to less respect because of the change. *See* 467 *U.S.* at 863–64, 104 *S.Ct.* at 2792, 81 *L.Ed.*2d at 715–16; Scalia, *supra,* at 517–19 (discussing *Chevron's* rejection of consistency requirement); Starr, *supra,* at 297–98 (same). Although the agency's analysis may have evolved over time, the analytical path has consistently led to the conclusion that national banks may export late fees. Late charges, moreover, are sufficiently close to the essence of "interest" to justify the OCC's decision to include them within the meaning of the word. The prototypical definition of "interest" as periodic interest is broad enough to encompass late charges. *See generally* Lawrence M. Solan, *Judicial Decisions and Linguistic Analysis: Is There a Linguist in the Court?,* 73 *Wash.U.L.Q.* 1069 (1995) (discussing definitional and prototypical interpretations of statutory language). I accept the conclusion of the banking regulators that interest for purposes of the NBA may include late charges and other fees charged by lenders in connection with a loan.

–IV–

–A–

Having determined that section 85's definition of "interest" includes late fees, the next question is whether that definition

preempts the RISA's prohibition against the imposition of such fees. More specifically, the question is whether Congress intended that the NBA, as interpreted by the OCC, should preempt state law.

Congress may preempt a state law by expressly stating that it so intends, *e.g., Cipollone v. Liggett Group, Inc.,* 505 *U.S.* 504, 515–16, 112 *S.Ct.* 2608, 2617, 120 *L.Ed.*2d 407, 422–23 (1992); by occupying an entire field of regulation, *e.g., Rice v. Santa Fe Elevator Corp.,* 331 *U.S.* 218, 230, 67 *S.Ct.* 1146, 1152, 91 *L.Ed.* 1447, 1459 (1947); or by enacting a federal statute that conflicts with a state law, *e.g., Hillsborough County, Fla. v. Automated Medical Laboratories, Inc.,* 471 *U.S.* 707, 713, 105 *S.Ct.* 2371, 2375, 85 *L.Ed.*2d 714, 721 (1985); *Maryland v. Louisiana,* 451 *U.S.* 725, 747, 101 *S.Ct.* 2114, 2129, 68 *L.Ed.*2d 576, 596 (1981).

Section 85 does not contain an express preemption clause. Given the dual regulation of banking by state and federal regulators, Congress may not have occupied completely the field of banking regulation. The question becomes whether section 85's definition of "interest," which permits national banks to impose late fees, conflicts with the RISA's prohibition of such fees.

My analysis begins with the Supremacy Clause of the United States Constitution:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
>
> [*U.S. Const., art.* VI, *cl.* 2.]

Ever since *Gibbons v. Ogden,* the Supremacy Clause has mandated preemption of state laws that "interfere with, or are contrary to the laws of Congress...." 22 *U.S.* (9 Wheat.) 1, 6 *L.Ed.* 23 (1824). Notwithstanding the supremacy of federal law, the United States Supreme Court has "never assumed lightly that Congress has derogated state regulation, but instead [has] addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law." *New York*

*Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 *U.S.* ——, ——, 115 *S.Ct.* 1671, 1676, 131 *L.Ed.*2d 695, 704 (1995); *see Maryland, supra,* 451 *U.S.* at 747, 101 *S.Ct.* at 2129, 68 *L.Ed.*2d at 595; *Rice, supra,* 331 *U.S.* at 230, 67 *S.Ct.* at 1152, 91 *L.Ed.* at 1459. The Court, however, has found conflict to be preemptive when "compliance with both federal and state [laws] is a physical impossibility." *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 *U.S.* 132, 142–43, 83 *S.Ct.* 1210, 1217–18, 10 *L.Ed.*2d 248, 257 (1963). It likewise has recognized preemption of state law when that law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 *U.S.* 52, 67, 61 *S.Ct.* 399, 404, 85 *L.Ed.* 581, 587 (1941). Preemption is not foreclosed, however, merely because a federal statute displaces a traditional subject of state regulation. *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 *U.S.* 141, 153, 102 *S.Ct.* 3014, 3022, 73 *L.Ed.*2d 664, 675 (1982); *Greenwood Trust, supra,* 971 *F.*2d at 828. To constrict unduly a federal statute to avoid interference with a state law would subvert the Supremacy Clause.

Against that background, the question recurs whether section 85, which permits a national bank to impose a late fee, and the RISA, which prohibits such a fee, are in conflict. In one sense, to state the question is to answer it. When state law prohibits an act that federal law permits, the conflict is apparent. True, section 85 does not mandate that national banks must charge late fees. The problem arises only when the national bank seeks to impose a late fee. By foregoing late fees, Citibank could avoid the conflict. That analysis, however, begs the question.

As with ascertaining the meaning of "interest," I find guidance on the question of preemption in the rulings of the OCC. In her February 17, 1995, letter, *supra,* OCC Chief Counsel Julie Williams ruled:

> [W]e reaffirm our previous conclusion that "interest" permitted under section 85 may be charged without reference to whether all or part of it is permissible under the laws of the state where the customer resides. If the law of the state where the

customer resides is different from the law of the state in which the bank is located, the former law has no effect on what the bank may charge as "interest."

*Accord* the Bowden Letter, *supra;* the Serino Letter, *supra; see also* Letter by Douglas H. Jones, Deputy General Counsel, FDIC No. 92–47, *Fed. Banking L.Rep.* (CCH) ¶ 81,534 at 55,730–31 (July 8, 1992) (reaching same conclusion under section 521); Letter by Douglas H. Jones, Deputy General Counsel, FDIC No. 93–27, *Fed. Banking L.Rep.* (CCH) ¶ 81,635 at 55,838–39 (July 12, 1993) (same).

Admittedly, an agency statement according a preemptive effect to a statute is not as persuasive as an express statutory clause. Given the pervasive role that Congress has entrusted to federal banking regulators, however, I would respect consistent regulatory rulings on preemption. *City of New York v. FCC,* 486 *U.S.* 57, 64, 108 *S.Ct.* 1637, 1642, 100 *L.Ed.*2d 48, 57 (1988) ("[I]f the agency's choice to pre-empt 'represents a reasonable accommodation of conflicting policies that were committed to the agency's care ..., we should not disturb it unless it appears ... that the accommodation is not one that Congress would have sanctioned.' ") (quoting *U.S. v. Shimer,* 367 *U.S.* 374, 383, 81 *S.Ct.* 1554, 1560, 6 *L.Ed.*2d 908, 915 (1961)).

Federal supremacy in the regulation of credit-card interest charges also makes sense. In many respects, credit cards have replaced the national currency. Residents of one state regularly make credit-card purchases from mail-order retailers in other states. Similarly, they use credit cards to charge meals, lodging, transportation, and other expenses when traveling throughout the nation and the world. Credit cardholders, moreover, can change their state of residence. Given the mobility of credit cardholders and transactions, federal regulation incorporating a bank's home-state's law is reasonable. The majority recognizes as much. It writes: "The theory of the NBA, as applied by federal and state courts, is that the borrower's state usury laws can be discarded because the customer either taking out a loan or using her 'lender credit card' partakes in a transaction in the national lender's home state." *Ante* at 68, 668 *A.*2d at 1052.

-B-

Close analysis of New Jersey law, moreover, reveals that the RISA impermissibly interferes with the congressional goal of preventing states from discriminating against national banks. *Tiffany, supra,* 85 *U.S.* at 412–13, 21 *L.Ed.* at 863–64. Although the RISA prohibits certain lenders from imposing late fees on delinquent borrowers, various statutory provisions expressly authorize other lenders to charge such fees. For example, *N.J.S.A.* 17:13–104(b) expressly authorizes credit unions to charge late fees: "A credit union may charge late fees ... not to exceed 20% of the principal balance and interest outstanding...." Similarly, *N.J.S.A.* 17:16C–42(b), *L.*1995, *c.* 43, § 1, as recently amended, provides that "[t]he holder of any retail charge account may collect a delinquency or collection charge in an amount not to exceed $10...." Moreover, *N.J.S.A.* 17:9A–59.7 authorizes banks to charge late fees on advance loans. Thus, some New Jersey lenders are authorized expressly to charge late fees.

In 1981, the New Jersey Legislature enacted the State Bank Parity Act (the Parity Act), *N.J.S.A.* 17:13B–1 to –2, which is modelled after section 85. The Parity Act provides: "Notwithstanding any ... statute to the contrary, any bank, savings bank, savings and loan association or credit union may charge a rate of interest ... permitted to any other lender by the laws of this State...." *N.J.S.A.* 17:13B–2.

If late fees are interest under the Parity Act, then any New Jersey bank may charge them. On that premise, the RISA would prohibit only national and out-of-state banks, such as Citibank, from charging late fees. That result would discriminate against out-of-state national banks that lend money to New Jersey borrowers. A state law that discriminates against out-of-state national banks conflicts directly with Congress's goals, and, therefore, is preempted.

The possibility of that conflict raises the question whether late fees are "interest" for purposes of the Parity Act. Title 17, which governs financial institutions, does not expressly define the term.

The relevant New Jersey statutes send inconsistent signals on the question whether the definition of interest excludes late fees. For example, *N.J.S.A.* 17:13–104(b), the same provision that authorizes credit unions to charge late fees, also authorizes credit unions to charge interest. Similarly, holders of retail charge accounts may charge interest under *N.J.S.A.* 17:16C–40 and late fees under *N.J.S.A.* 17:16C–42. Furthermore, *N.J.S.A.* 17:9A–59.6 discusses interest rates on advance loans, and *N.J.S.A.* 17:9A–59.7 authorizes late fees on those loans.

Although New Jersey statutes apparently distinguish annual interest and late fees, I cannot ignore the Legislature's unequivocal statement that it enacted the Parity Act as a corollary to section 85. The Assembly Banking and Insurance Committee Statement that accompanied the Parity Act declared that the Act

> would give state chartered banks, savings banks, savings and loan associations, and credit unions the same "most-favored-lender" authority that national banks presently enjoy. By the provision of 12 *U.S.C.* [§] 85, national banks may take interest at the rate allowed by the laws of any state.... The [OCC], who supervises national banks, has interpreted this to mean that national banks may charge interest not only at the rate permitted by state law to banking institutions, but also at the rate for a similar type of loan made by any licensed lender.... This legislation, therefore, provides [similar] parity to state-chartered institutions.

In the Parity Act, the Legislature intended to grant state banking institutions the same benefits that national banks enjoy under the NBA, as construed by the OCC. Under the Parity Act, therefore, state banks, like national banks, may charge late fees as interest.

The New Jersey Department of Banking has concluded that because late fees are interest under the NBA, they are interest for the purposes of the Parity Act. *See* Letter from Francis P. Carr, Assistant Commissioner, Department of Banking (Oct. 14, 1994). Although informally expressed, the assistant commissioner's letter is the department's only expression of its understanding of the meaning of interest in the Parity Act. Both the state and federal legislative schemes rely on regulation by administrative agencies. Because the Legislature has entrusted the department with the regulation of state banks, the department's interpretations of state

banking laws are entitled to judicial deference. *Lammers, supra,* 134 *N.J.* at 274, 633 *A.*2d 526.

Admittedly, the Legislature has not drawn distinct lines; it could have expressed its intent more definitively. We are remitted to finding the Legislature's intent in a statutory mosaic. The majority sees one picture. I see another.

I conclude that the definition of interest in the Parity Act includes late fees. Under the Parity Act, because credit unions and retailers may charge late fees, "any bank, savings bank, [or] savings and loan association" chartered in New Jersey also may charge such fees.

Because state-chartered banks may charge late fees to New Jersey customers, a state law, such as the RISA, that prohibits out-of-state national banks from charging such fees would constitute impermissible discrimination in violation of the Supremacy Clause. In sum, I would hold that the NBA conflicts with, and thus preempts, the RISA.

-V-

Interestingly, the majority concludes that in the future out-of-state national banks may impose limited late-payment fees on New Jersey cardholders. The Court so concludes because the 1995 amendment to *N.J.S.A.* 17:16C–42, *L.*1995, *c.* 43, § 1, extends the right to charge late fees of up to $10 to holders of retail charge accounts. For me, however, the source of a national bank's authority to impose late fees is not the RISA, but the NBA. By declaring that the RISA determines the amount of the late fee that a national bank may charge, the majority has inverted the Supremacy Clause so that state law trumps federal law. The need for uniform regulation of national banks, not misplaced notions of federalism, should prevail.

Ultimately dividing the majority and dissent are differing perceptions of the roles of Congress, federal banking regulators, and state courts in regulating national banks. The majority takes a

position reminiscent of states'-rights advocates who opposed federal regulation of interstate commerce and of national banks. Banking, however, is integral to the national economy. Credit cards and other innovations such as electronic money transfers have converted consumer lending from a local to a national activity. In that context, the need for federal control is paramount. Until such time as Congress explicitly determines whether interest includes late charges, I would defer to the judgment of the OCC.

## -VI-

My colleague, Justice O'Hern, reaches the same result as do I, but through a different analysis. He proceeds from the major premise that the NBA expresses a general congressional intent, apart from the terms of the statute, that states must not favor state banks over national banks. *Post* at 92, 668 *A.*2d at 1064. His minor premise is that New Jersey law permits lenders to impose late charges as interest. *Id.* at 94, 668 *A.*2d at 1065–1066. From this, he concludes that by permitting New Jersey banks, but not national banks, to impose such charges, New Jersey law violates the NBA.

My problem with his analysis is with its divination of congressional intent apart from the terms of the statute. For me, the reason that the NBA trumps RISA is that section 85 expressly permits national banks to charge "interest at the rate allowed by the laws of the State ... where the bank is located." "Interest," as previously explained, includes late charges. Close examination of the authorities cited by Justice O'Hern reveals that they rely not on metaphysical notions of congressional intent, but on the specific words of the statute. *Post* at 93–94, 668 *A.*2d at 1065–1066. I also find misplaced his concern that Congress did not intend states to "export" their "consumer protection attitudes" to other states. *Id.* at 96, 668 *A.*2d at 1067.

The mischief hides in the term "export." When a South Dakota national bank charges interest, including late fees, as allowed by

that state to a borrower in New Jersey, the charge is legal because the NBA expressly allows it, not because South Dakota is "exporting" its interest rate to New Jersey. The authority for the imposition of the charge is not South Dakota law, but the NBA. Congress has defined the standard to measure the allowable rate of interest; that standard is interest as allowed by the national bank's home state. As Citibank's home state, South Dakota merely provides the point of reference. Only in a metaphorical sense is South Dakota "exporting" its rate of interest. In reality, a national bank may impose interest as allowed by its home state because Congress has so ordained.

For the preceding reasons, I respectfully dissent.

GARIBALDI, J., joins in this dissent.

O'HERN, J., dissenting.

I agree with the majority that the National Bank Act does not preempt state consumer protection laws that prohibit late charges on credit card accounts. I would, however, allow national banks to assess late charges against credit card holders in New Jersey, not because the late charges are interest under the National Bank Act (they are not) and not because Congress has authorized the Comptroller of the Currency to preempt the State's consumer protection law, but because New Jersey law permits lenders to impose such late charges and may not discriminate against national banks that seek to impose the same charges.

In 1864 Congress enacted the National Bank Act, c. 106, 13 Stat. 99 (NBA). Section 85 of the NBA now provides that any national bank

> may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidence of debt, interest at the rate allowed by the laws of the State * * * where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater * * *.
>
> [12 U.S.C.A. § 85.]

In addition to addressing interest rate differentials between state and national lending institutions, the NBA had a more profound purpose and effect—to assure that national banking institutions were never put at any economic disadvantage in competition with state-chartered institutions.[1]

Before the Civil War, Jacksonian distrust of concentrated power of mercantile interests had brought about the demise of national banks and the rise of the state banking systems. *Clarke v. Securities Indus. Ass'n,* 479 *U.S.* 388, 413, n. 5, 107 *S.Ct.* 750, 764, n. 5, 93 *L.Ed.*2d 757, 777, n. 5 (1987) (Stevens, J., concurring).

> Enactment of the National Bank Act was part of Congress's attempt to induce state-chartered banks to convert to national charters in order to achieve several federal objectives, such as the development of a national currency, the creation of a market for federal bonds to finance the war, and the use of the national banks as depositories.
>
> [Edward L. Symons, Jr., *The "Business of Banking" in Historical Perspective,* 51 *Geo.Wash.L.Rev.* 676, 699 (1983).]

If state-chartered banking institutions were permitted to make loans on more favorable terms than nationally chartered institutions, then nationally chartered institutions would be at an economic disadvantage. Congress "deliberately settled upon a policy intended to foster 'competitive equality' " between national banks and state banks. *First Nat'l Bank in Plant City, Fla. v. Dickinson,* 396 *U.S.* 122, 131, 90 *S.Ct.* 337, 342, 24 *L.Ed.*2d 312, 318 (1969) (quoting *First Nat'l Bank of Logan, Utah v. Walker Bank & Trust Co.,* 385 *U.S.* 252, 261, 87 *S.Ct.* 492, 497, 17 *L.Ed.*2d 343, 349 (1966)). In the *Walker Bank* case, involving branch banking issues, the Court wrote: "To us it appears beyond question that the Congress was continuing its *policy of equalization* first

---

[1] Sections 521 through 523 of the Depository Institutions Deregulation and Monetary Control Act of 1980, *Pub.L.* No. 96–221, 94 *Stat.* 132, authorize other federally insured depository institutions to collect interest as allowed by the laws of the state in which they are located. Those provisions generally confer on federally insured state banks the privileges that national banks enjoy under the NBA. For convenience of analysis, I refer only to the federally chartered institutions.

adopted in the National Bank Act of 1864." 385 *U.S.* at 261, 87 *S.Ct.* at 497, 17 *L.Ed.*2d at 349 (emphasis added).

Because equalization, not preemption, is the congressional policy, New Jersey cannot grant late-charge privileges to its financial institutions and not to national banks:

> The purpose of section 85 is [1] to adopt the state law, relating to interest rates permitted, to permit national banks to charge the rate of interest allowed to competing lenders in the state, *and* [2] to guard against unfriendly federal-state legislation or ruinous competition with state chartered or licensed lenders. This interpretation of Section 85, commonly referred to as "the most favored lender policy" puts national banks on an equal footing with the most favored lenders in the state without giving them an unconscionable and destructive advantage over all state lenders. The statute prevents state legislation which purports to give state banks or possibly any state lender advantages over national banks.
>
> [*United Missouri Bank of Kansas City, N.A. v. Danforth,* 394 *F.Supp.* 774, 779 (W.D.Mo.1975) (emphasis added).]

The New Jersey Department of Banking reasons that state-chartered credit unions "are authorized to offer credit cards and charge late charges without limit." (Letter from Francis P. Carr, Assistant Commissioner, New Jersey Department of Banking, to Dennis R. Casale 1 (Oct. 14, 1994) (citing *N.J.S.A.* 17:13–105(c)). Thus, even though late charges are not interest, a national bank must be permitted to impose late charges as long as a state lender may impose them. *See Saul v. Midlantic Nat'l Bank/South,* 240 *N.J.Super.* 62, 81, 572 *A.*2d 650 (App.Div.) (recognizing that under "most favored lender" doctrine, national banks may make loans on same terms as state-chartered credit union), *certif. denied,* 122 *N.J.* 319, 585 *A.*2d 338 (1990).

In addition, *S.* 1412, signed into law on March 7, 1995, amended the Retail Installment Sales Act (RISA), *N.J.S.A.* 17:16C–1 to –61, the statute on which plaintiffs have based their claims in this case. The 1995 amendment expressly authorizes the holder of any retail charge account to collect flat late charges. *N.J.S.A.* 17:16C–42. After that amendment there can be no question that a nationally chartered credit card lender may not impose such late charges, at least to the extent allowed under *S.* 1412. Were it otherwise,

Citibank explains, there would be favoritism shown to state lenders:

> The favored lender, by contracting for flat, contingent charges from late payers, can protect itself against risks and costs associated with delinquencies while keeping monthly percentage charges low to attract good customers who are consistently punctual. The disfavored lender, who cannot collect late charges, tends to get all the customers who anticipate paying late and tends to lose the customers with strong credit and habits of punctuality because it must impose higher monthly percentage charges to make up for its inability to impose late charges.

That competitive advantage cannot be given to the state-chartered institutions. *Northway Lanes v. Hackley Union Nat'l Bank & Trust Co.,* 464 *F.*2d 855, 863 (6th Cir.1972), held that because a Michigan-chartered savings and loan association was permitted to charge a borrower (in addition to interest) the closing costs of a real estate loan, a national bank could legally impose such additional charges. The *Northway Lanes* court quoted a principal drafter of the NBA, Senator John Sherman of Ohio, who explained that the purpose of the NBA was "to confer on these national banks the same privileges that are conferred by the laws of the States on other associations and individuals * * * [and] to place the national banks in each state on precisely the same footing with individuals and persons doing business in the state by its laws." 464 *F.*2d at 861 (quoting *Cong.Globe,* 38th Cong. 1st Sess. 2126 (1863)).

"National banks have been national favorites." *Tiffany v. National Bank of Missouri,* 85 *U.S.* (18 Wall.) 409, 413, 21 *L.Ed.* 862, 864 (1874). The NBA confers on them "*at least competitive equality*" with other lenders and a "possible advantage over state banks in the field of interest rates." *Fisher v. First Nat'l Bank of Omaha,* 548 *F.*2d 255, 259 (8th Cir.1977) (emphasis added). No state may create a competitive disadvantage by favoring any class of state lenders over national lenders, as New Jersey would favor its state lenders if they alone can impose late charges. An Opinion Letter from the Office of the Comptroller of the Currency explains:

[I]f a state allows state banks to charge credit card annual fees at flat rates, then section 85 allows national banks to do so as well. If national banks were not allowed to match state-regulated lenders on these flat loan charges, then the "most favored lender" principle would be destroyed.

[Letter from Julie L. Williams, Chief Counsel, to John L. Douglas (Feb. 17, 1995), 1995 WL 71676 (OCC), *6.]

Plaintiffs seek to avoid the application of the "most favored lender" doctrine by arguing that The Credit Union Act, *N.J.S.A.* 17:13–73.1 to –125, did not always authorize unlimited late fees on retail charge cards, insisting that the more specific provisions of RISA controlled retail credit card transactions. Plaintiffs' interpretation of the law is of little consequence as long as the State regulators continue to permit state-chartered lenders to impose late charges. The NBA forbids precisely that form of discrimination against national banks.

States have a profound interest in their consumer protection laws. *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 *U.S.* 299, 314, 99 *S.Ct.* 540, 548, 58 *L.Ed.*2d 534, 545–46 (1978), held only that "interest rates of one State [can be] 'exported' into another" because a literal application of the plain language of "rate allowed" in Section 85 compelled that result. Only a distorted reading of Section 85 would allow exportation of the consumer protection attitudes of the home state of the national bank. See William G. Bornstein, Comment, *Extension of the Most Favored Lender Doctrine Under Federal Usury Law: A Contrary View*, 27 *Vill.L.Rev.* 1077, 1107–08 (1981–82) (analyzing the *Marquette* holding).

I cannot imagine that Congress intended that South Dakota or Delaware be permitted to export their concepts of consumer protection and to preempt and nullify the consumer protection laws of New Jersey. I therefore agree with that portion of the Court's opinion.

*For reversal* —Chief Justice WILENTZ, and Justices HANDLER, STEIN and COLEMAN—4.

*For affirmance* —Justices POLLOCK, O'HERN and GARIBALDI—3.